559 So.2d 1321 (1990)
STATE of Louisiana
v.
John Francis WILLE.
No. 87-KA-1309.
Supreme Court of Louisiana.
March 12, 1990.
Rehearing Denied April 5, 1990.
*1323 William J. Guste, Jr., Atty. Gen., John M. Crum, Jr., Dist. Atty., Thomas Daley, George Ann Hayne Grougnard, Asst. Dist. Attys., for appellee.
Michael S. Fawer, Denise LeBoeuf, New Orleans, for appellant.
LEMMON, Justice.
This is an appeal from a conviction of first degree murder and a sentence of death. The principal issues on appeal involve (1) the admission of hearsay testimony by a Federal Bureau of Investigation (FBI) agent relating to his interview with defendant's girlfriend and the girlfriend's daughter, who were witnesses to the murder and did not testify at trial; (2) the admission of pretrial identification testimony *1324 by a fast food store employee without requiring her to identify defendant at trial as the person she saw in the area on the night of the murder; (3) the denial of a mid-trial request for a recess to secure the presence of two witnesses; (4) the invalidity of an aggravating circumstance found by the jury; (5) requiring defendant's girlfriend's daughter to plead the privilege against self incrimination before the jury; and (6) the actual conflict of interest between defendant and his trial attorney.[1]
Facts
These proceedings arose out of the June 2, 1985 abduction, rape and murder of eight-year old Nichole Lopatta. This tragic episode began when defendant, accompanied by his girlfriend, Judith Walters, and Walters' fourteen-year old daughter, Sheila, drove from their residence in Milton, Florida to Louisiana, where defendant had lived most of his life. After they entered Louisiana, defendant stopped to pick up an acquaintance, Billy Phillips, who was hitchhiking on the highway. Defendant had been drinking alcohol during the trip, and he continued drinking with Phillips as they drove into New Orleans.
The following excerpts from defendant's tape-recorded confession, given on August 27, 1985 while he was in custody in Florida on unrelated charges, vividly relate the events surrounding the murder:[2]
A. Uh, he [Phillips] had started talking about he had screwed several other young girls.
Q. By young, what did he mean by young?
A. Around eleven, twelve, thirteen years old.... He said there was this young girl he wanted to go pick up and take her riding.... He started giving directions.
Q. Are you on the Westbank now?
A. On the Westbank. And, we stopped there and he gets out the car, he goes and
. . . . .
Q. Then what happened?
A. He come back to the car with the little girl and
Q. This little girl is Nicole Lopata (sic).
A. Uh, huh.
Q. Okay, go ahead.
A. And well, we just left and went riding, you know, a little while later he fixed me another drink.
Q. Where is the girl sitting?
A. In the back seat.
Q. Where is Billy sitting?
A. In the back seat, too.
. . . . .
Q. Tell us exactly what Billy was saying?
A. Asked me if I'd ever screwed anybody real young. He told me that I ought to try it. I told him it wasn't my game and it shouldn't be his.
Q. Okay, then what happened?
A. He kept rubbing, you know, saying you know man, come on man, don't be no chicken, come on do it, man.
. . . . .
Q. Then what happened?
A. He ended up talking me into doing it.
Q. Where did this take place, John?
A. I guess back on 51 [Highway 51 north of LaPlace].
Q. Were you in the car, out of the car, or where?
A. Out of the car.

*1325 Q. Who was there at the time?
A. Me and Billy.
Q. And who else?
A. Sheila and Judy they were in the car.
. . . . .
Q. Tell me what happened in the sequence of events, who did what, when. Will you do that for me, please?
A. Little Billy screwed her first, then I did, then he did again.
Q. This is all in her vagina.
A. Yea, and then, you know, he kept beating on her, you know.
Q. He kept what?
A. Beating on her.
Q. He kept beating on her.
A. She wouldn't behave, she wouldn't be still at least.
. . . . .
Q. Did you or Billy or both put your penises in her mouth.
A. Billy did. She bit him, I'd expect any young girl would do that.
Q. What happened? What did Billy do when she bit him?
A. He punched her.
Q. Where did he punch her at?
A. Punched her once in the head. She cried out.
Q. Was heDid he have his penis in Little Nicole's (sic) mouth while you were having your penis in her vagina, was that going on at the same time?
A. Yes.
. . . . .
Q. When he hit her and she started crying, what happened after that?
A. I stopped, sat down on the side.
Q. What did he do?
A. He continued on doing what he wanted to.
Q. What was that?
A. Screwing her in her behind.
Q. Was she still alive then?
A. Yea, she screamed two or three times.
Q. What did she scream out, John?
A. She called for her mama.
Q. Calling her mama?
A. Yea.
Q. What happened then after he was having anal intercourse with her, what happened then?
A. The more she'd yelled the more he'd beat her.
. . . . .
Q. How do you think she died? John. How did she really die?
A. I smothered her to get her out of her misery.
Q. Did you do that?
A. Yes, I did.
Q. To put her out of her misery. You smothered her to put her out of her misery. She was in awful pain wasn't she John? What's your answer?
A. Yes.
Q. Okay. Did you choke her or did you smother her?
A. A little of both.
Q. A little bit of both. Did you choke her first and then smother her, or did you smother and then choke her?
A. Smothered her and then she passed out. Then I choked her.
Q. And then you choked her after she passed out?
A. Yes.
. . . . .
Q. Tell me about little Nicole (sic) after she was dead. Were you sure she was dead after you finished choking her?
A. No, I wasn't. She just wasn't moving.
Q. Did she have her eyes open or closed when she died?
*1326 A. Open.
Q. Open. Was her face badly beaten?
A. Billy split her face a couple of times with his fist.
Q. Okay. Did you or Billy have intercourse with her after she was dead? John did you see Billy do that?
A. Yes. It pissed me off. I was sitting there just freaking out and I looked up and this motherfucker was back on her again.
Q. Where was he, where is he inserting his penis?
A. Up her rectum.
Q. Up her rectum.
A. Up her vagina.
Q. He was, he then had sexual intercourse in both her vagina and her rectum after she was dead?
A. Yea.
Q. John did you?
A. No, I didn't, not that I remember.
Q. Do you think you might have?
A. It's possible, I don't know.
Q. Did Billy ask you to?
A. Billy was saying try this, try that, try this.
Q. Do you think maybe you did?
A. As fucked up as I was, probably.
Q. John, in reality what do you remember, did you, did you? I know this is hard John, did you have intercourse with that little girl's dead body?
A. Yes, I did.
Q. Did you have intercourse in her anus after she was dead?
A. Yes.
Q. Did you have intercourse in her vagina?
A. Yes.
. . . . .
Q. Why don't you tell us about what happened that made you kill Billy Phillips?
A. It just got me mad.
Q. Why?
A. He talked me into doing something that I didn't want to do. And then he was going to fuck with my girlfriend and my daughter.
Q. What happened?
A. I flipped out.
Q. Okay, then what happened?
A. I started stabbing him and shit. I knocked him down on the ground and sat on him and just kept stabbing him, stabbing him, and stabbing him, stabbing him.
Q. Then what happened?
A. I tried to cut his prodicals off.
Q. You mean his penis and balls?
A. Yea.
Q. Alright. Then what happened?
A. I got a hacksaw out of the tool box in the trunk. I cut his hand off.
Q. Why did you cut his hand off?
A. So if the son of a bitch would die wasn't dead, he wouldn't fuck with nobody else. Bled to death.
Q. What did you do with his hand?
A. Kept it and disposed of it at Popeyes.
. . . . .
Q. You put, you and Judy put Billy's body in the trunk and you put Nicole's (sic) body in the back seat, where'swhere's Sheila?
A. In the front seat.
. . . . .
Q. Okay. Then what happened?
A. I wanted to get rid of the bodies. I disposed of Billy's body over the side of the bridge.
. . . . .
Q. Alright, and you were looking for a place to deposit Nicole's (sic) body, is that right?
A. Yes.

*1327 Q. What did you do?
A. Got out and put her out of the car.
Q. You put who out?
A. Nicole (sic).
Q. How did you put her out?
A. I picked her up.
Q. Okay.
A. And carried her.
Q. Alright.
A. To the woods.
Q. Alright. Then you're on 51 again, is that correct?
A. Yes. I think we went to New Orleans, I'm not sure, I think.
Q. Okay. Where did you go?
A. To a Popeye's Chicken.
. . . . .
Q. While Judy is ordering something inside Popeye's, what were you doing, if anything?
A. Getting all the evidence together to get rid of it.
Q. What evidence is that?
A. Knife and hacksaw.
Q. The knife and hacksaw? Anything else?
A. The hand.
Q. Billy's hand.
A. Yea.
. . . . .
Q. Alright. Then what did you do?
A. Put the stuff in the bags and put it in the garbage can.
. . . . .
Q. Then what did you guys do? What happened then?
A. We headed back towards Florida.
After the tape-recorded interview defendant made an additional verbal statement which an FBI agent reported as follows:
He stated that during his sexual intercourse with the little girl he had achieved sexual orgasms. He stated that he was able to achieve sexual orgasms with the little girl before her death and after her death.
WILLE further admitted that after he had dumped the little girl's body, he engaged in anal intercourse with her dead body. He said that WALTERS had followed him down to where he had dumped the little girl's body. He stated that while he was engaging in anal intercourse with the dead girl he dragged WALTERS over to him by her hair. He stated that he threatened her. He told her that he would kill her if she ever told anyone about what had happened to the little girl or BILLY. WILLE admitted that he achieved a sexual orgasm while having anal intercourse with the dead girl. WILLE went on to state that he immediately wanted to have vaginal intercourse with WALTERS. WILLE stated that he did so in the old fashion "man on top" position. WILLE stated that he also achieved a sexual orgasm with WALTERS.
WILLE stated that he is not sorry for killing BILLY and BILLY deserved to die. WILLE concluded by looking at SA SCOTT and making the following statement, "I think I just put my ass in the electric chair."
According to the victim's mother, the child was kidnapped late in the afternoon of June 2, 1985.
The bodies were discovered in separate locations on June 6, 1985. The autopsy report on the child indicated death by strangulation, as well as a broken jaw with three different areas of fracture, violent tearing of the vagina and rectum, blunt injuries to the chest, and a fractured skull. Phillips' body had been stabbed eighty times, and one hand had been cut off. His inner thigh was also mutilated.
Deborah Davis, an employee of Popeye's Fried Chicken in Kenner, positively identified defendant in a photographic lineup as the person who asked for two empty bags on the night of the murder.
On the basis of defendant's confession and the corroborating evidence the jury *1328 found defendant guilty of first degree murder.[3] After the presentation of additional evidence in the bifurcated sentencing phase the jury recommended a sentence of death. The jury unanimously found the existence of three aggravating circumstances: (1) the offender was engaged in the perpetration or attempted perpetration of an aggravated rape and an aggravated kidnapping; (2) the offender had been previously convicted of an unrelated murder; and (3) the offense was committed in an especially heinous, atrocious, or cruel manner. See La.C.Cr.P. art. 905.4(a), (c) and (g).
Hearsay Testimony
Defendant urges that the trial court erred in allowing FBI Special Agent Victor Harvey to testify as to the substance of assertions made by Judith and Sheila Walters in interviews conducted by Harvey. Even though Judith and Shelia Walters did not appear as witnesses in this case, Agent Harvey was allowed to testify as follows:
A. We had, once again, the usual investigative steps, but no real suspects. This continued for approximately two months, from the 6th [of June] to the, about August the 10th, when one of the agents assigned to the task force advised that perhaps we should go to Milton, Florida. Specifically to interview one Judy Walters of Norco that may have some, some information concerning the Lopatta killing. Myself and another agent traveled to, to Milton, Florida. And on the 10th of August interviewed Miss Walters for an extensive period. Based upon the information supplied, and the investigative conclusions that we were able to draw, we were able to force or focus our entire investigative attention on Judy Walters and her alleged boyfriend, John Wille. John Wille, based upon not only the interview of the 10th but all of the interviews with Miss Wille, I mean Miss Walters, immediately became a prime suspect in this matter. Through Walters' information we were able to determine that her daughter might have information, Sheila Walters. We interviewed her on two difference [sic] occasions and became certain that John Wille was, was our prime suspect.
. . . . .
Q. So what what did you do at that time?
A. All right. Like I said, one of, we interviewed Miss Walters on numerous occasions. Each time she would tell us more about the crime, more specific facts, things that were, were possible to cooberate [sic]. One of the first things we did, of course, was show her a picture of the child to make sure that we were dealing with, with the same abduction. There are abductions going on all over the country. Miss Walters had
(Interrupted by objection)
. . . . .
A. Yes, sir. Based upon the series of interviews with Miss Walters our investigative conclusion became very strengthened that John Wille was responsible for these, these crimes. These crimes being both the murders we've discussed. Further cooberation [sic] was, as to this conclusion, was, was, furnished by the two interviews of her daughter.
. . . . .
Q. After that what was done?
A. Based upon the peculiarity of the story as it was related to me personally I asked prior to the formal interview of Mr. Wille that Miss *1329 Walters be brought back to this area and her story physically retraced as to times, dates, movements. This was also done in my presence and recorded by me. I have a log of that. Once again, this meshed chronologically and totally with her, with her, with her evidence that she had supplied to me concerning Mr. Wille. I have that available. On the 27th I asked that Special Agent Terry Scott and Lieutenant Boy Hay of this Sheriff's Office formerly interview Mr. Wille. They did. Mr. Wille furnished them with a taped statement as to his involvement in both murders.
. . . . .
Q. After, what did you do after this was done?
A. Based upon, based upon the statements given, the fact that the information and the statements matched the, matched the peculiarity of the offense, and the other information I mentioned, the State, I prepared and submitted a report, and the State charged Mr. Wille with the crimes he's on trial here for.
Q. Was Sheila Walters ever interviewed?

A. Yes, sir. I personally interviewed Sheila Walters, the fourteen year old daughter of Judy Walters, on two occasions and she completely cooberated [sic](interrupted by objection). (emphasis added).
Although defense counsel entered several hearsay objections about identification of the victim and corroboration of the eyewitnesses' statements, Agent Harvey was permitted to testify that assertions by the eyewitnesses to the murder had led him to conclude defendant was the prime suspect and to become "certain" defendant was responsible for the two killings. Defendant argues that the jury could only conclude from Harvey's testimony that Judith and Sheila Walters had told him defendant was the murderer while admitting to their own involvement in the events.
Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, when the statement is being offered as an assertion to show the truth of matters asserted therein and thus rests for its value upon the credibility of the out-of-court asserter. State v. Martin, 356 So.2d 1370 (La.1978); La.C.Evid. art. 801(C). One of the primary justifications for the exclusion of hearsay is that the adversary has no opportunity to cross-examine the absent declarant to test the accuracy and completeness of the testimony. The declarant is also not under oath at the time of the statement. Moreover, the confrontation clause of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him". U.S. Const amend. VI. There is no opportunity for confrontation when an assertion by one party is presented through the testimony of another party.
The relationship between the confrontation clause and hearsay evidence was discussed in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The Court recognized that the reasons for excluding hearsay assertions were (1) to insure that the witness will make his assertions under oath, thus impressing him with the seriousness of the matter and subjecting untrue statements to a penalty for perjury; (2) to force the witness to submit to cross-examination, characterized as the "greatest legal engine ever invented for the discovery of truth"; (3) to permit the jury which decides the defendant's fate to observe the demeanor of the witness in making his statements, thus aiding the jury in assessing the witness' credibility. Id. at 158, 90 S.Ct. at 1935.
Many decisions have additionally recognized the inherent unreliability of hearsay statements by accomplices who do not appear at trial. In Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), *1330 the defendant and co-defendant were charged with committing a double murder and were tried jointly in a bench trial in which neither defendant testified. The Court held that the trial court's reliance on the co-defendant's confession as substantive evidence against the defendant violated the defendant's right under the confrontation clause. The Court stated:
Our cases recognize that this truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination. As has been noted, such a confession `is hearsay, subject to all the dangers of inaccuracy which characterize hearsay generally.... More than this, however, the arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.
Id. at 541, 106 S.Ct. at 2062 (citing Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). Because the conviction of the defendant was based, at least in part, on this unreliable evidence, the Court reversed the conviction.
In State v. Dupree, 377 So.2d 328 (La. 1979), this court reversed the defendant's conviction obtained on the basis of hearsay testimony. The trial court had permitted police officers to narrate statements given by accomplices that implicated Dupree in the crime, although those accomplices did not testify. The officers testified that the accomplices named the defendant as the instigator of the plan to bomb a car. This court noted that these statements, which were made to the police during the custodial interrogation following their arrests, were not made in furtherance of the conspiracy and did not fall within the co-conspirator exception to the hearsay rule. Thus, admission of the hearsay testimony constituted reversible error which deprived the defendant of his right to confront and cross-examine the witnesses against him.
In the present case the prosecutor, citing State v. Calloway, 324 So.2d 801 (La.1976), State v. Monk, 315 So.2d 727 (La.1975), and State v. Smith, 400 So.2d 587 (La.1980), argues that testimony by a police officer, as to his action taken in response to a person's out-of-court statement, is admissible, not to prove the truth of the out-of-court statement, but to explain the sequence of events leading to the arrest of the defendant from the viewpoint of the investigating officer. However, those cases are distinguishable from the present case. The substance of Officer Harvey's testimony in the present case was that two eyewitnesses named defendant as the perpetrator of the crime, while the substance of the out-of-court assertions in the cited cases did not significantly connect the defendant with the crime.[4]
*1331 Admission of information received by a police officer in the investigation of a crime, on the basis that such information explains the officer's presence and conduct and therefore does not constitute hearsay evidence, is an area of widespread abuse. McCormick on Evidence § 249 (E. Cleary 3d ed. 1984).[5] Such information frequently has an impermissible hearsay aspect as well as a permissible nonhearsay aspect, and the court in determining admissibility should balance the need of the evidence for the proper purpose against the danger of improper use of the evidence by the jury. Id. The fact that an officer acted on information received in an out-of-court assertion may be relevant to explain his conduct, but this fact should not become a passkey to bring before the jury the substance of the out-of-court information that would otherwise be barred by the hearsay rule.[6] G. Pugh, Louisiana Evidence Law 429-431 (1974).
When an out-of-court statement, such as information received by a police officer during an investigation of a crime, has both an impermissible hearsay aspect and a permissible nonhearsay aspect, the issue of relevancy becomes significantly interrelated with the hearsay issue. If the nonhearsay content of the statement has little or no relevance, then the statement should generally be excluded on both relevance and hearsay grounds. Marginally relevant nonhearsay evidence should not be used as a vehicle to permit the introduction of highly relevant and highly prejudicial hearsay evidence which consists of the substance of an out-of-court assertion that was not made under oath and is not subject to cross-examination at trial.
There was no true issue in the present case as to the propriety of any action taken by Agent Harvey during his investigation of the Lopatta murder. Indeed, an investigating officer's testimony at trial (as opposed to testimony at a motion to suppress), explaining his conduct after an investigation, almost always has only marginal relevance at best.[7] The real purpose of Harvey's testimony in the present case about the information received from Judith and Sheila Walters was to place before the jury the fact that their statements had named defendant as the *1332 killer of Nichole Lopatta.[8] The value of the statements rested upon the credibility of the out-of-court assertions. Because Judith and Sheila Walters did not testify, evidence of the fact that their statements named defendant as the killer was otherwise barred by the hearsay rule. Clearly, the extremely marginal relevance of Agent Harvey's testimony for the purpose of explaining his conduct in the investigation was greatly outweighed by the danger that the jury would use this testimony as substantive evidence that Judith and Sheila Walters had named defendant as the killer.[9] The only truly relevant information conveyed by Agent Harvey to the jury was his conclusion, after interviewing two eyewitnesses to the crime for which defendant was on trial, that defendant was the perpetrator and that the eyewitnesses' version of the events was completely corroborated by physical and other evidence uncovered by the investigation. Because the assertions related by Judith and Sheila Walters to Agent Harvey, the substance of which was conveyed to the jury, were presented almost solely for their relevance and assertive value in establishing defendant's guilt and were not given under oath or ever subjected to cross-examination, and because such assertions by accomplices are inherently suspect, the testimony should have been excluded as hearsay and irrelevant evidence.
Nevertheless, the erroneous admission of the hearsay and irrelevant evidence does not require a reversal of defendant's conviction because the error was harmless beyond a reasonable doubt. Reversal is mandated only when there is a reasonable possibility that the evidence might have contributed to the verdict. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Gibson, 391 So.2d 421 (La.1980); Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988).
Confrontation errors are subject to a Chapman harmless error analysis. Delaware v. Van Arsdell, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt. Id. at 684, 106 S.Ct. at 1438. Factors to be considered by the reviewing court include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case". Id. at 684, 106 S.Ct. at 1438.
In the present case Agent Harvey's testimony regarding the statements by Judith and Sheila Walters was essentially cumulative of much more detailed information contained in defendant's own confession, the voluntariness and reliability of which have not been substantially challenged. Significantly, defendant's confession itself was otherwise fully corroborated by numerous evidentiary links between defendant, the victim and the crime. The victim was identified through her fingerprints; circumstantial evidence linked the disappearance of the victim with the arrival of defendant and others at the apartment complex; defendant was identified as the person who asked for a bag at Popeye's on the night of *1333 the murder; the locations of the bodies of Nichole Lopatta and Billy Phillips were found was consistent with defendant's statements regarding disposition of the bodies; and the physical evidence of the injuries sustained by Nichole Lopatta and Billy Phillips matched the details of the incident related by defendant.
Thus, the prosecutor presented an extremely strong case consisting of a very detailed confession which was fully corroborated by physical, circumstantial and identification evidence. As the reviewing court, we conclude there is no reasonable possibility that Agent Harvey's erroneously admitted testimony, which conveyed undetailed information that two accomplices had named defendant as the perpetrator, contributed to the verdict.[10] The error was harmless beyond a reasonable doubt. See State v. Walters, 523 So.2d 811 (La.1988), a per curiam denial of certiorari in Judith Walters' case which corrected the intermediate court's recitation of an improper harmless error standard and concluded that the trial court had correctly admitted the "interlocking" statement of Sheila Walters.
Identification by Deborah Davis
Defendant contends that the trial court erred in allowing Deborah Davis, who was not called upon to identify defendant in court, to testify as to her out-of-court identification of defendant as the person who asked for a bag at Popeye's on the night of the murder. Relying on State v. Jacobs, 344 So.2d 659 (La.1977), defendant argues that a positive identification by Davis of defendant in court was a prerequisite to her testimony that she had previously identified a picture of defendant as the man she saw at Popeye's on June 2, 1985.
In the Jacobs case the victim testified that the defendant "looked very much like" the perpetrator of the crime. The state then called several police officers who testified that the victim had made a positive identification of the defendant prior to trial at a photographic lineup. The court, distinguishing State v. Ford, 336 So.2d 817 (La. 1976), noted that an officer's testimony concerning a pretrial identification by a witness may be allowed to corroborate the testimony of the witness, but is inadmissible, because of its hearsay nature, when the witness does not testify about the pretrial identification, especially when the witness could not make a definite identification at trial.
This court held earlier in Ford that the admission of hearsay identification testimony is not reversible error if the person who made the pretrial identification also testifies at trial as to the identification. The case at bar is factually more closely aligned with Ford than with Jacobs, where the positive pretrial identification was used to bolster a tentative identification at trial. In the present case Davis specifically testified, without objection, as to her pretrial identification of defendant's picture in a photographic lineup as the person who entered the restaurant on June 2, 1985 and asked for a specific size bag. Since there was no suggestion that Davis could not identify defendant in court, the fact that she was not specifically asked to make an identification in court relates only to the weight of her testimony regarding the photographic lineup. Moreover, Davis did answer affirmatively a question by defense counsel asking if Photograph No. 3 was "Mr. Wille's photograph". The record as a whole establishes that Davis' out-of-court identification, repeated by her at trial, referred to the accused who was in court at the trial.
Finally, in United States v. Owens, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), the Court allowed evidence that the witness had previously identified the defendant *1334 as his assailant, even though the witness could not remember at trial (because of injuries inflicted in the attack) enough details of the attack to positively identify the defendant in court. The Court concluded that the use of the witness' prior identification as substantive evidence did not violate the confrontation clause which insures only the opportunity to cross-examine a witness, and not necessarily cross-examination which is beneficial to the defendant.
In the case at bar, even if Davis did not make (or could not make) a positive identification of defendant in court, her prior out-of-court identification would not necessarily be excluded because she was available for cross-examination.
Mid-Trial Recess
Defendant contends that the trial court erred in denying his mid-trial request for a recess to secure the presence of two witnesses crucial to his defense. Defendant argues that the testimony of Sandy Becker, a witness to his presence in Florida on the afternoon of June 2, 1985, and of Dr. William Rodriguez, a time-of-death specialist who might testify that Nichole Lopatta and Billy Phillips did not die within the same twenty-four hour period, was critical to the defense since there was no other evidence to cast doubt upon the accuracy of the confession.
Defense counsel notified the prosecutor several days prior to trial of his intent to call Sandy Becker, who was then residing in Virginia, as an alibi witness. Counsel secured an order on December 1, 1986 to obtain Becker's attendance at the trial on December 6.
During the state's case-in-chief Agent Harvey testified that Sandy Becker's name first arose during his initial interview with Judith Walters. According to Harvey, he contacted Becker, who had Walter's son at her home in Florida during the period of time in which the murder occurred, and she stated that she did not know defendant's whereabouts between May 29 and June 6. Two days before his trial testimony Agent Harvey recontacted Becker, who told him she definitely remembered that defendant was at her home in Florida in the early afternoon of June 2. After further questioning, Becker conceded that it could have been June 3. Harvey further testified that the drive from Florida to New Orleans takes four to four and one-half hours.
When the state rested its case, defense counsel moved for a recess, stating that he had just learned Becker could verify defendant's presence in Milton, Florida on June 2, but had not spoken to Becker. The trial judge denied the motion, stating that the uncertainity of Becker's testimony did not warrant the recess.
Defendant argues that he was entitled to have the jury assess Becker's credibility rather than to have the witness excluded on the basis of biased hearsay testimony.
Both U.S. Const. amend. VI and La. Const. art. I, § 16 guarantee that a criminal defendant has the right of compulsory process and the right to present a defense. Defendant's claim of violation of his right to present a defense relates to the denial of his motion for a mid-trial recess.
A motion for a recess is evaluated by the same standards as a motion for a continuance. State v. Warren, 437 So.2d 836 (La.1983). To be entitled to a recess to secure the presence of a witness, the defendant must establish that (1) the absent witness is expected to testify to material facts so that the presence of the witness at the trial is necessary; (2) the witness will probably be available at the time to which the trial is deferred; and (3) due diligence was used in an effort to procure attendance of the witness. La.C.Cr.P. art. 709.
The decision on a motion for a recess lies within the discretion of the trial court and will not be overturned absent an abuse of that discretion. State v. Gordy, 380 So.2d 1347 (La.1980).
Defendant did not introduce any evidence about the material facts to which Becker would be expected to testify. The *1335 only evidence in this regard came from Agent Harvey, who testified that Becker could not testify positively one way or the other. Moreover, any testimony by Becker that defendant was in Florida in the early afternoon of June 2 would not rule out defendant's presence in the New Orleans area in late afternoon. Defendant also failed to demonstrate that Becker would be available to testify at any time in the immediate future. Finally, defendant failed to demonstrate that due diligence was exercised in attempting to procure Becker's presence at trial. The existence of possible alibi witnesses was shown in defendant's November 26, 1986 motion for continuance, which noted that counsel learned five days earlier of potential alibi witnesses in Florida which the investigator furnished by the court was then in the process of interviewing. Despite the knowledge of both sides as to Becker's whereabouts prior to trial, only the state's investigator spoke to her. Significantly, if defendant was at Becker's home on June 2, he could have advised his attorney of that fact well in advance of trial.
Considering the circumstances surrounding defendant's request for a recess in order to secure Becker's presence, we cannot say that the trial judge abused his discretion in denying the motion.
The second aspect of defendant's argument is that he should have been granted the recess in order to secure the services of Dr. William Rodriguez, a time-of-death specialist. Defendant asserts that since the state did not supply the defense with copies of the photographs taken at the scene of the crime until December 5, 1986, the day before the state rested its case, Dr. Rodriguez did not receive the photographs in his Shreveport office until after the trial was over. According to the defense, the expert, after examining the photographs, concluded that the deaths of Lopatta and Phillips did not occur on the same day.
On the other hand, the prosecutor points out that the autopsy records and photographs had been available to defendant for inspection since March 12, 1986 and that copies of all but one of the twenty-six photographs had been supplied prior to trial. The one photograph, which had been taken with an instamatic camera and could not be easily copied, was not supplied to the defense until the trial was almost complete.
There is no indication in the record why the other available photographs and autopsy reports were not forwarded to Dr. Rodriguez prior to December 4, 1986 or why Dr. Rodriguez, the Director of Laboratories for the Caddo Parish Coroner's Office, could not have traveled from Shreveport to St. John the Baptist Parish to view the one missing photograph. There is also no indication why the analysis could not have been performed without the one photograph that was difficult to duplicate.[11]
Defendant has thus failed to establish that the court erred in denying his motion to recess until Dr. Rodriguez could finish a scientific analysis of the crime scene and autopsy photographs and reports. There was a total failure to demonstrate due diligence in securing the witness' presence for trial. We cannot say that the trial judge abused his discretion in denying the request.
Invalid Aggravating Circumstance
Defendant claims that the aggravating circumstance of "especially heinous, atrocious, or cruel manner" in La.C.Cr.P. art. 905.4(g) does not provide clear and objective standards to channel the jury's discretion. Citing Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), defendant argues that La.C. Cr.P. art. 905.4(g) is unconstitutionally vague, even in light of the narrowing construction placed on that aggravating circumstance by the trial judge's instruction *1336 to the jury.[12]
This aggravating circumstance can be supported only by proof that the defendant engaged in torture of the victim or the pitiless infliction of unnecessary pain. State v. Brogdon, 457 So.2d 616 (La.1984); State v. Sonnier, 402 So.2d 650 (La.1981). This court has upheld the validity of the "especially heinous, atrocious or cruel manner" aggravating circumstance when the trial judge has given an appropriate narrowing instruction, as occurred in this case.
The Maynard decision does not require a different result. In State v. Deboue, 552 So.2d 355 (La.1989), this court stated:

Maynard, however, does not preclude the application of this aggravating circumstance with a limiting construction, which permits the jury to distinguish those types of murders which qualify as being committed in an especially cruel, heinous or atrocious manner and those which do not. In fact, the United States Supreme Court recognized that one limiting construction which has been employed by other states is the requirement of torture or serious physical abuse, and it implicitly approved that limiting construction by noting that "[w]e also do not hold that some kind of torture or serious physical abuse is the only limiting construction of the heinous, atrocious, or cruel aggravating circumstance that would be constitutionally permissible". (citation omitted).
There was sufficient evidence to establish that there was torture or the pitiless infliction of unnecessary pain on the victim in this case. In addition to defendant's confession, the medical evidence clearly demonstrated that the eight-year-old victim was raped both anally and vaginally, repeatedly beaten to the point of broken and shattered bones, and strangled to death. On this record the jury could have reasonably concluded that defendant sexually assaulted the victim and participated in the severe beatings, despite defendant's protestations that he smothered and choked her to put her out of her misery after severe beatings inflicted by Phillips alone. The jury, properly guided by the limiting construction contained in the jury charge, could have found on the record in this case that this aggravating circumstance was proved beyond a reasonable doubt. Moreover, even if there was insufficient evidence to support this aggravating circumstance, this court has repeatedly held that when a statutory circumstance is found invalid or not supported by the evidence, a death sentence will be upheld if the evidence was sufficient to support at least one valid aggravating circumstance and the introduction of evidence on the invalid circumstance did not inject an arbitrary factor into the proceeding. Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); State v. Jones, 474 So.2d 919 (La.1985). The evidence offered in support of this particular aggravating circumstance was otherwise clearly admissible to show the nature of the offense and the character and propensities of the offender. Therefore, this evidence did not inject an arbitrary factor into the proceedings.
Requiring Witness to Plead Privilege before Jury
Defendant contends that the death sentence should be reversed because the prosecutor called Sheila Walters, the fourteen-year old daughter of Judith Walters, to the stand during the sentencing phase for the sole purpose of exercising her privilege against self-incrimination. Defendant argues that the prosecutor did not call the witness during the guilt phase because he knew she would invoke the privilege and chose to exploit her invocation of the privilege in the sentencing phase in order to prejudice the jury against defendant. Defendant *1337 cites State v. Haynes, 291 So.2d 771 (La.1974), State v. Berry, 324 So.2d 822 (La.1976), and State v. Day, 400 So.2d 622 (La.1981), as cases in which this court condemned such a practice.[13]
On two occasions during his closing argument in the guilt phase, defense counsel made references to the fact that the prosecutor did not call Judith or Sheila Walters to testify. Counsel argued to the jury:
You were not there, I was not there. Judith Walters, was under subpoena, was there. Yet she had not been called to testify one word from that witness chair. She was there. Sheila, the daughter, was there. Not one word of testimony came from that witness chair from either one of those people.... [W]e are saying there is doubt as to what happened at that scene. There are people alive today who know and were not called to testify in this case.
During rebuttal argument the prosecutor responded that Judith Walters had not been called because she had charges pending against her.
During the presentation of evidence in the sentencing phase defense counsel made three additional references to the fact that there were living witnesses to the crime who had not been called by the state.
After the repeated assertions by the defense that neither Judith nor Sheila Walters had been called to the stand, the state called Sheila Walters during the penalty phase. The defense did not object to the state's calling the witness or to any questions asked of her.[14]
If the prosecutor knows a witness will claim a valid privilege not to testify, the prosecutor should not call the witness for the purpose of impressing upon the jury the fact of the claim of privilege. Standards for Criminal Justice § 3-5.7 (2d ed. 1980). A similar prohibition is imposed on defense counsel. Standards, supra, § 4-7.6. However, because of the legitimate concern when the prosecutor fails to call a witness who possibly has relevant information that the jury will be unaware of the reason for the failure, the defense counsel has a correlative obligation not to argue any evidentiary inference from the absence of the witness. Standards, supra, Commentary. Issues relating to a claim of privilege should be heard outside the presence of the jury whenever possible.
This court has recognized that it is error to allow the prosecutor to call before the jury a witness who he knows will invoke the privilege against self incrimination, when there is no other purpose for *1338 calling the witness except to have the jury draw evidentiary inferences from the fact that the witness claimed the privilege. There was another purpose, however, for calling the witness before the jury in this case.
During the guilt phase the prosecutor had properly refrained from calling Judith and Sheila Walters because he knew that they would invoke their privilege not to testify. Defense counsel (who is not the present counsel on appeal) improperly commented on the prosecutor's failure to call these witnesses and urged the jury to draw evidentiary inferences from the absence of the witnesses.
The prosecutor was able to explain, by rebuttal argument, his not calling Judith Walters, an eyewitness to the events surrounding the murder, as a witness during the guilt phase. As a method of rebutting evidentiary inferences arising from his failure to call Sheila Walters as a witness in the guilt phase, the prosecutor called her in the second portion of the bifurcated trial.
The prohibition against the prosecutor's calling before the jury a witness who he knows will assert a privilege not to testify is designed not only to prevent the jury from drawing improper inferences from the fact of the witness' claiming the privilege, but also to deter the prosecutor from using bad faith trial tactics. Here, the prosecutor acted in utmost good faith in this regard in the guilt phase, but was frustrated by counsel's improper comments on the absence of the witness and his urging the jury to draw inferences from the absence. Under similar circumstances the Court in United States v. Robinson, 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988), held that while the prosecutor generally is prohibited from commenting on the defendant's failure to testify, Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), such a comment is permissible if made as a fair response to an argument that the defendant was never given a fair chance to explain his position. Under the circumstances of the present case we conclude the prosecutor's calling Sheila Walters before the jury, although he knew she would invoke the privilege not to testify, was a fair response to the comments made by defense counsel and did not violate the purpose of the pertinent prohibition.
Conflict of Interest
Defendant contends that he was denied effective assistance of counsel because of an actual conflict of interest that existed between him and his trial attorney. Defendant argues this conflict was known to counsel and the trial court, but was not revealed to him.
Referring to documents attached to his brief in this court, defendant argues that his trial counsel, a former state senator, pleaded guilty on November 21, 1984 to the federal felony charge of submitting a false statement to an agency of the United States; that the indictment, guilty plea, and sentence received substantial media coverage, particularly in St. John the Baptist Parish where the attorney resided and the trial was held; that the attorney received a three-year suspended sentence, one of the conditions of probation being performance of 416 hours of community service; that the attorney's appointment to represent defendant was in partial fulfillment of the condition of probation; and that neither his attorney nor the trial court ever advised him of these facts.
Defendant contends there was an actual conflict between his interest in an impartial jury and his attorney's interest in not publicizing the fact of his felony conviction. Defendant's position is that only conflict-free counsel could have properly questioned the jurors on voir dire whether their attitude toward defendant would be affected by their knowledge that the person who had confessed to the murder was being represented by a convicted felon who was appointed by the court as part of his obligation to perform community service. Suggesting that his attorney may have failed to pose these questions on voir dire because of personal embarrassment, defendant asserts that this unrevealed conflict *1339 prevented his trial attorney from being dedicated solely to his client's interest and from rendering effective assistance of counsel, especially during the critical stage of jury selection. Citing Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), defendant argues that the basic evil in conflict of interest situations lies in "what the advocate finds himself compelled to refrain from doing". Id. at 490-91, 98 S.Ct. at 1181-82. Defendant further argues that the failure of the court or his attorney to reveal this conflict deprived him of the right to object to this appointment or to choose to represent himself.
When a claim of ineffective assistance of counsel is raised on appeal, the issue is generally referred to post-conviction proceedings in which both sides can introduce evidence and the validity of the claim can be properly determined. A narrow exception to this general rule of deferring ineffective assistance claims to post-conviction proceedings has been recognized when "the record discloses evidence needed to decide the issue of ineffective assistance of counsel and that issue was raised by assignment of error on appeal, in the interest of judicial economy". State v. Ratcliff, 416 So.2d 528, 530 (La.1982); State v. Seiss, 428 So.2d 444 (La.1983). The present case, however, does not present an instance when the narrow exception should be exercised, inasmuch as the record on appeal does not contain any evidence on the issue.
Nevertheless, this court on several occasions in capital cases has pretermitted determination of the validity of a death sentence because of a possibly meritorious claim of ineffective assistance of counsel and has remanded the case to the trial court under Supreme Court Rule XXVIII, § 5, for an evidentiary hearing on the claim and a determination whether the evidence creates a reasonable doubt as to the death sentence. State v. Williams, 480 So.2d 721 (La.1985); State v. Fuller, 454 So.2d 119 (La.1984); State v. Smith, 400 So.2d 587 (La.1981). This procedure allows an expeditious determination of ineffective assistance claims while the case is still in the state system and before the affirmation of a death sentence.
The ineffective assistance claim in the present case warrants an evidentiary hearing. However, unlike the claim in the Williams, Fuller and Smith cases, the present claim involves the guilt determination as well as the penalty. We therefore conditionally affirm both the conviction and sentence, but remand the case to the district court and reserve to the trial judge the power to grant a new trial if he determines after the evidentiary hearing that the ineffective assistance claim so requires. See State v. Simmons, 328 So.2d 149 (La. 1976). If the judge determines that the claim is without merit, defendant's right to appeal that ruling is reserved, but the conviction and sentence will be affirmed in the absence of a timely appeal.
Capital Sentence Review
This court is required to review every death sentence to determine whether the sentence is constitutionally excessive. Supreme Court Rule XXVIII; La.C.Cr.P. art. 905.9. The court considers (1) whether the sentence was imposed under the influence of passion, prejudice or arbitrary factors; (2) whether the evidence supported a finding of a statutory aggravating circumstance; and (3) whether the sentence, in view of both the offense and the offender, is disproportionate to the penalty imposed in other cases.
At the time of the crime defendant was a twenty-five year old white male who had never married and had no children. He was the oldest son of five children of living parents. He completed the twelfth grade, and his intelligence level (IQ of 70 to 100) was in the medium range. Psychological testing revealed no character or behavior disorders and no other pertinent psychiatric or psychological information. He was not under the influence of narcotics or dangerous substances at the time of the offense.
The victim was an eight-year old white female. Defendant and the victim did not know each other prior to the murder.
*1340 Defendant was represented by two appointed attorneys. His lead attorney had over thirty years of legal experience, and his practice involved criminal and civil cases in equal proportions. The other attorney, who had under five years of experience, practiced both criminal and civil law.
Defendant's parents stated that defendant had no significant emotional problems before the age of fourteen, but they noticed a change in his behavior after two of his grandparents died within a span of two days. According to his parents, defendant had an extensive history of telling grandiose lies to anyone who would listen. At about age sixteen his parents suspected that he may have a drug problem. He may have attempted suicide at least once during this time period.
Defendant's parents put him out of their home on several occasions because of his constant stealing from relatives and others. He drifted from place to place and began his involvement with several women, most of whom had small children. He told his parents he was attracted to such women because he wanted to help care for neglected and abused children.
Defendant was convicted of a September, 1985 criminal trespass and received a sentence of fifty-seven days in parish prison. For the December, 1985 murder conviction in Florida defendant was sentenced to life imprisonment without possibility of parole for twenty-five years.[15] Charges of simple battery, criminal trespassing, disturbing the peace and simple criminal damage to property in March, 1985 were dismissed. There is no disposition recorded for June, 1985 charges of simple kidnapping, cruelty to a juvenile, and sexual battery.
As to the influence of passion, prejudice or arbitrary factors, both the defendant and the victim were caucasian, and race was not a factor at trial.
A sanity commission found defendant sane at the time of the crime and capable of assisting his counsel at trial. There was no suggestion that defendant suffered from a mental disease or defect, and no evidence was presented by defendant in support of his insanity defense.
Defendant's confession was properly admitted, as were photographs of the victim.
Defendant specifically argues that several prejudicial and arbitrary factors were introduced into his trial. The first argument involves Agent Scott's testimony that defendant admitted orally, after completing the taped confessions, to achieving sexual satisfaction with the body of the victim and to enjoying the killing of Billy Phillips. Defendant cites Herzog v. State, 439 So.2d 1372 (Fla.1983), and Jackson v. State, 451 So.2d 458 (Fla.1984), in support of his argument. However, in those cases the court held that actions after the death of the victim (evidence of burning the victim's dead body and evidence of hiding the murder weapon and cleaning the automobile) were irrelevant to the aggravating circumstance of "a crime which is especially heinous, atrocious, or cruel". The statements in the present case, however, were not offered to support a particular aggravating circumstance, but were introduced to show the circumstances of the offense and the character and propensities of the offender. La.C.Cr.P. art. 905.4.
Defendant next argues that an element of arbitrariness was injected into the proceedings when the prosecutor called Sheila Walters to the stand during the sentencing phase, knowing that she would assert the privilege against self incrimination. As discussed in detail earlier, this action did not unfairly prejudice defendant in any way.
Defendant further argues that two statements by Special Agent Harvey improperly put before the jury his conclusion that defendant beat the victim. The statements by Harvey were that "[t]he most glaring *1341 inconsistency in this case was who beat the child's jaw and broke it. And John Wille was responsible for that" and that "[t]he child was rendered unconscious when John Wille, with his hands, made her unconscious".
These statements were elicited on cross-examination by defense counsel in answer to questions concerning the discrepencies between the confession of Judith Walters and that of defendant. Defense counsel asked specifically what those discrepencies were, and Harvey stated that one was whether defendant or Phillips had broken the child's jaw. The answer, at least in part, was not responsive to the question, but there was no objection and no request for an admonition. Because of the nature of the crime itself, it is unlikely that this one statement injected prejudice, passion or other arbitrary factors into the jury's determination of an appropriate sentence.
The statement by Harvey that the child was rendered unconscious when defendant began to strangle her was also an unresponsive answer to the specific question. Again there was no objection or request for an admonition. Nevertheless, defendant in his confession stated that he "[s]mothered her then she passed out" and then "choked her". Agent Harvey's challenged answer, although unresponsive, was a correct characterization of the evidence presented at trial. This statement could not have interjected undue prejudice at the sentencing phase.
As to evidence supporting the finding of an aggravating circumstance, the jury returned three: defendant had been previously convicted of an unrelated murder; the killing occurred during an aggravated rape and an aggravated kidnapping; and the offense was committed in an especially heinous, cruel and atrocious manner.
Defendant first urges that the jury could not have found that he had a prior conviction for an unrelated murder. This court has squarely held that a conviction for a murder committed subsequent to the murder for which the murderer is on trial can support the finding of this aggravating circumstance, as long as the conviction occurred before the sentencing phase of the current trial. State v. Brooks, 541 So.2d 801 (La.1989). Here, the prosecutor introduced a certified copy of defendant's guilty plea to first degree murder in Florida, as well as testimony by the Florida prosecuting attorney. This aggravating circumstance is fully supported by the record.
Defendant next argues that the evidence did not support a finding that the crime was committed in an especially heinous, cruel or atrocious manner. As noted earlier, the evidence supports a conclusion that the crime involved elements of torture or pitiless infliction of unnecessary pain and suffering.
As to the sufficiency of the evidence of an aggravated rape, the victim's mother testified that the child was eight years old at the time of the crime, and the evidence supports a conclusion that she was unmarried. Defendant admitted in his confession that he penetrated the child's vagina and rectum by the use of force. This aggravating circumstance is fully supported by the record.[16]
A proportionality review is not required by federal constitutional law. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nevertheless, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness of sentence in Louisiana. State v. Kyles, 513 So.2d 265 (La.1987).
*1342 The death penalties in State v. Loyd, 489 So.2d 898 (La.1986), State v. Brogdon, 457 So.2d 616 (La.1984), and State v. Watson, 449 So.2d 1321 (La.1984), which were imposed in St. John the Baptist Parish or adjoining St. Charles Parish, fully demonstrate that the death penalty in this case was not disproportionate.[17] Moreover, the fact that co-participant Judith Walters received a life sentence in State v. Walters, 514 So.2d 257 (La.App. 5th Cir.1987), cert. denied, 523 So.2d 811 (La.1988), does not affect this conclusion. Walters did not inflict any injury on the child, did not rape or sodomize the child, and did not actually kill her. Any leniency of the jury in Walters' case cannot arguably be used to demonstrate excessiveness in the present case.
Decree
The conviction and the sentence of death are conditionally affirmed on the evidence in the record on appeal. However, a final determination of the appeal is pretermitted, and the case is remanded to the district court for an evidentiary hearing and for determination of the claim of ineffective assistance of counsel resulting from a conflict of interest, in accordance with this opinion, with defendant's right reserved to appeal from an adverse decision on the issue.
COLE and MARCUS, JJ., dissent and assign reasons.
COLE, Justice (dissenting).
I respectfully dissent from the majority's holding insofar as it conditionally affirms defendant's conviction and sentence and remands to the trial court for an evidentiary hearing on the issue of conflict of interest. I believe the relevant facts, even considered in the light most favorable to defendant, do not disclose a conflict of interest between defendant and his attorney. Therefore, an evidentiary hearing would be futile.
Defendant did not raise his ineffective assistance of counsel claim at trial. Therefore, in order to establish a violation of the Sixth Amendment, he must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. State v. Edwards, 430 So.2d 60 (La.1983). Such claims are generally deferred to post conviction relief. State v. Barnes, 365 So.2d 1282 (La.1978).
As the majority notes, there is a "narrow exception" to this rule set forth in State v. Ratcliff, 416 So.2d 528 (La.1982): if the record discloses evidence needed to decide the issue of ineffective assistance of counsel and that issue was raised by assignment of error on appeal, in the interest of judicial economy the issue will be considered. See also State v. Seiss, 428 So.2d 444 (La.1983). I believe the case before us falls under this exception and the conflict issue may be resolved in this court.
The record shows defendant's attorney did not question jurors on whether their attitude toward defendant would be affected if they knew the attorney was a convicted felon. On remand, the only additional *1343 "evidence" on this issue defendant could offer would relate to the facts surrounding his attorney's earlier conviction and resulting public service obligation. However, accepting such facts and considering them in the light most favorable to defendant, I do not find a conflict as recognized at law.
The classic conflict situation is one where the trial counsel is representing two distinct persons with adverse interests. In the present case, it is difficult to say the attorney is "representing" his own interest in a way adverse to defendant's interest. Defendant argues his attorney had an adverse interest since he was attempting to avoid publicizing his own conviction. Defendant's sole support for this proposition are three federal circuit court cases: United States v. Mouzin, 785 F.2d 682 (9th Cir.1986); United States v. White, 706 F.2d 506 (5th Cir.1983); United States v. DeFalco, 644 F.2d 132 (3rd Cir.1979). On closer examination, two of the cases are distinguishable; the third actually argues against D's position.
In White, supra, White was charged with escaping from the custody of a U.S. Marshall. He was represented by Jimmy Brumfield. At the time of trial, both Brumfield and his wife were under investigation for complicity in White's escape. The court found representation of White by Brumfield was an actual conflict of interest which constituted ineffective assistance of counsel as a matter of law.
In White, supra, is clearly distinguishable from the present case. White was an example of the classic conflict, in that the attorney and client had different and conflicting interests. As the court noted, Brumfield might not present detailed evidence of the escape or call certain witnesses for fear of incriminating himself, would be ineligible to testify as a witness to the escape, and might resist plea bargaining for fear White would turn state's evidence against him. Obviously, none of these considerations are present in the case before us, since the attorney's prior conviction was totally and completely unrelated to defendant's case.
In DeFalco, supra, DeFalco was indicted in the U.S. District Court of New Jersey. He retained Verdirama as his attorney. Unknown to DeFalco, Verdirama was indicted before the same judge who presided over DeFalco's case. During DeFalco's appeal, Verdirama entered into a plea bargain on the charges against him with the same U.S. Attorney's office that was his adversary on DeFalco's appeal. The court held the facts showed "a possible conflict." It therefore reversed a lower court ruling denying post-conviction relief and remanded for a showing of whether there was a deliberate and knowing waiver by DeFalco of his right to effective assistance.
DeFalco is of questionable authority, since the U.S. Supreme Court subsequently rejected the "possible conflict" standard and instead required defendants to prove an actual conflict of interest. Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). It is unclear whether DeFalco could have met this heightened standard.
Secondly, DeFalco is again distinguishable from the present case. The attorney's indictment arose in the same court and before the same judge as defendant's trial. The attorney was actively plea bargaining on his own behalf with the same U.S. Attorney's office that was acting as his adversary in defendant's trial. By contrast, in the case before us, the attorney's conviction was in a completely separate system (federal as opposed to state). The attorney's conviction was final; he was not actively plea bargaining during defendant's trial.
The third case cited by defendant, Mouzin, supra, actually runs counter to his argument. In that case the defendant's attorney was disbarred during the course of the defendant's trial for conduct in an unrelated matter. The defendant argued since neither the attorney nor the trial judge informed him of this fact, the services of the lawyer must be deemed ineffective under the Sixth Amendment. The court disagreed, finding no conflict under the circumstances.
*1344 Clearly, if an attorney's failure to inform the client of his disbarment during the course of a trial does not create a conflict that rises to the level of ineffective assistance, it it difficult to see how an attorney's earlier, unrelated felony conviction could do so. Defendant in the present case, like the Mouzin defendant, makes vague allegations that the attorney's performance was somehow impaired. However, a review of the record shows defendant's attorney acted in a competent and professional manner during the trial. His earlier conviction was irrelevant to his behavior at trial.
Therefore, it appears there is no legal authority for defendant's argument that he has shown a conflict of interest. The only case cited by defendant in which the court found an actual conflict between a defendant and his attorney was White. White involved extensive involvement by the attorneys in the underlying crime. Those unusual circumstances are not present here.
None of the cases suggest there is a basis for an ineffective assistance claim simply because an attorney was convicted of an unrelated crime in a separate court system. Under defendant's argument, virtually any fact in the attorney's background not revealed to the jury could form a basis for an ineffective assistance claim. This is not the state of the law. Since defendant's claim has no basis in law, an evidentiary hearing is clearly unnecessary.
For the foregoing reasons, I respectfully dissent from the majority's holding.
MARCUS, Justice (dissenting).
I would affirm the conviction and sentence of death finding no merit to defendant's contention that he was denied effective assistance of counsel because of a conflict of interest that existed between him and his trial attorney. Accordingly, I respectfully dissent from the remand to the district court for an evidentiary hearing on this issue.
NOTES
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is part of the official record.
[2] The law enforcement officers who questioned defendant had already obtained a detailed statement from Judith Walters and were able to ask probing questions.
[3] Walters was tried separately for her participation in the crime. She was convicted of first degree murder and sentenced to life imprisonment. State v. Walters, 514 So.2d 257 (La.App. 5th Cir.1987), cert. denied, 523 So.2d 811 (La. 1988).
[4] In the Smith case an officer was allowed to testify that he was advised of the shooting incident. Because this testimony was offered to show why the officer began an investigation of the incident and not to prove the truth of the assertion, this court concluded that the testimony was not hearsay. Significantly, the report of the shooting did not connect the defendant with the crime.

In the Calloway case an arresting officer was allowed to testify that he had received a radio communication that the two suspects in a store robbery were travelling in a black Cadillac. This court held that the admission of the testimony was not hearsay since it was admitted merely to explain events preceding the arrest of the defendants in a black Cadillac. Significantly, there was other proper evidence that a black Cadillac was parked in front of the store at the time of the robbery, and the officer's testimony was merely cumulative as to this fact.
Finally, the Monk case held it was not hearsay when a deputy testified that he had received a radio message that a robbery had been committed at a bank by two men who fled on a motorcycle. The robbers were apprehended on a motorcycle shortly after the robbery four miles from the bank. Significantly, numerous other witnesses testified that the two robbers wearing motorcycle helmets and ski masks were seen leaving the bank on a motorcycle, and the deputy's testimony as to the motorcycle was merely cumulative as to this fact.
[5] The treatise identified the area of widespread abuse as follows:

In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct. His testimony that he acted "upon information received", or words to that effect, should be sufficient. Nevertheless, cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great.
[6] This court has previously restricted the admission of this kind of evidence. In State v. Thompson, 331 So.2d 848 (La.1976), the trial court permitted an officer, under the guise of explaining his subsequent conduct, to testify that an anonymous informant had specifically identified the defendant as one of two men involved in an armed robbery. In reversing the conviction, this court stated that the officer could testify as to his receipt of information from the informer and his subsequent conduct, but not as to "the content of the statement of this anonymous witness, not sworn o[r] subject to cross-examination at the trial, to the effect that this defendant had committed the crime for which he was on trial". Id. at 849. The court noted that the content of the out-of-court statement (which was used before the judge to obtain a search warrant) was not admissible at trial for any relevant issue before the jury.
[7] In Teague v. State, 252 Ga. 534, 314 S.E.2d 910 (1984), the court observed:

It will be seen that only in rare instances will the "conduct" of an investigating officer need to be "explained", as in practically every case, the motive, intent, or state of mind of such an officer will not be "matters concerning which the truth must be found." At heart, a criminal prosecution is designed to find the truth of what a defendant did, and, on occasion, of why he did it. It is most unusual that a prosecution will properly concern itself with why an investigating officer did something. (emphasis in original).
[8] Harvey, an experienced investigator, carefully avoided saying that the Walters told him defendant killed the child. However, his testimony that statements by the Walters caused him to conclude defendant was the prime suspect and to become convinced that defendant was responsible for the crimes clearly conveyed to the jury the substance of the Walters' out-of-court assertions, as well as his belief in the reliability of the statements.
[9] The relevancy issue is at the core of the problem. The statements by the Walters may have been relevant to the issue of probable cause for arresting defendant, but that issue was one for the judge and not for the jury. State v. Thompson, 331 So.2d 848 (1976).
[10] We further note that no objection was made until Agent Harvey attempted to state that the information obtained from the Walters was corroborated by other evidence secured in the investigation.

While this court generally considers assignments of error in a capital case without regard to the timeliness of an objection, the lack of a timely objection may be considered as a relevant factor in determining harmless error.
[11] According to the prosecutor's brief, the instamatic photograph portrayed the same crime scene as set forth in twenty-five 8 × 11 prints provided to the defense prior to trial.
[12] As to this aggravating circumstance, the trial judge instructed the jury that "[i]n order for the jury to find that the offense was committed in an especially heinous, atrocious, or cruel manner there must exist evidence from which they, the jury, can find beyond a reasonable doubt that there was torture or the pitiless infliction of unnecessary pain on the victim".
[13] In State v. Haynes, 291 So.2d 771 (La.1974), this court noted in dicta, after reversing the conviction on other grounds, that "the deliberate attempt of the prosecution to question a member of the defense staff on what the defendant had told him, in violation of the attorney-client privilege, and the belittling before the jury of defense counsel for asserting it, is not compatible with the standards of fair trial and of fair prosecution expected in American courts". Id. at 773.

In State v. Berry, 324 So.2d 822 (La.1976), the defendant attempted, over the state's objection, to require a witness to take the stand and claim the privilege against self incrimination in front of the jury. The trial judge held a hearing outside the presence of the jury and determined that the witness could properly claim the privilege. This court held that "[i]t is improper conduct for either the prosecution or the defense knowingly to call a witness who will claim a privilege, for the purpose of impressing upon the jury the fact of the claim of privilege". Id. at 830.
In State v. Day, 400 So.2d 622 (La.1981), the state called the defendant's wife to the stand and forced her, over defense counsel's objection, to assert her spousal privilege. The state then referred to the testimonial privilege on four separate occasions, arguing that use of the privilege indicated her testimony would be detrimental to the defendant. This court concluded this procedure was reversible error, holding that "when the State knows that a witness will exercise a valid privilege, it is reversible error to require the witness to exercise his privilege in front of the jury". Id. at 624.
[14] Sheila Walters gave her name and address and answered a few preliminary questions. When asked if she had traveled to LaPlace with her mother, defendant and Billy Phillips on June 2, 1985, her counsel asserted the privilege. A second question about the events of the evening brought the same response. She was then excused as a witness.
[15] Defendant was convicted on December 3, 1985 in Florida of the first degree murder of a young black male hitchhiker. His statement indicated that he beat the man, threw him out of his car, and rolled over him several times. Judith Walters was also present at the time of this offense.
[16] Defendant did not question the sufficiency of the evidence of an aggravated rape and an aggravated kidnapping. The prosecutor, however, did not argue aggravated kidnapping as an aggravating circumstance. Nevertheless, the failure of one statutory aggravating circumstance does not invalidate a death penalty if another aggravating circumstance is supported by the record, so long as the evidence offered in support of the arguably unproven aggravating circumstance did not inject an arbitrary factor into the proceedings. Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); State v. Sawyer, 422 So.2d 95 (La.1982). The kidnapping evidence here clearly was properly admitted.
[17] In Loyd the twenty-five-year old white defendant kidnapped the three-year old white female victim, raped her vaginally and anally, and drowned her in a ditch. The defendant had one prior conviction for misdemeanor theft, a steady work history, two years of college, and had been honorably discharged from the service.

In Brogdon the nineteen-year old white defendant and a seventeen-year old accomplice lured the eleven-year old white female victim into their car, drove her to an isolated spot, raped her repeatedly, forced oral sex, and then tortured her by beating her with a brick, shoving sharp objects into her vagina, and cutting her with a broken bottle. The defendant, who was borderline mentally retarded, was under the influence of alcohol at the time.
In Watson the twenty-four-year old black defendant kidnapped a twenty-five-year old white female medical student, robbed her with a gun, raped her vaginally and anally, and shot her in the back of the head to prevent her identifying him. He had low to normal intelligence, a seventh grade education, a minimal employment record, a history of drug abuse, and an extensive history of incarceration during his adult life.
See also State v. Jones, 474 So.2d 919 (1985), and State v. Copeland, 530 So.2d 526 (1988), for death penalty cases from other judicial districts in which the defendant kidnapped and raped young victims.