681 So.2d 1217 (1996)
STATE of Louisiana
v.
Marcus HAMILTON.
No. 92-KA-1919.
Supreme Court of Louisiana.
September 5, 1996.
Rehearing Denied October 4, 1996.
*1220 Nicholas J. Trenticosta, New Orleans, for Applicant.
Richard P. Ieyoub, Attorney General, Harry F. Connick, District Attorney, Jack Peebles, New Orleans, Karen G. Arena, for Respondent.
LEMMON, Justice.[*]
This is a direct appeal to this court from a conviction of first degree murder and a sentence of death. La. Const. art. V, § 5(D). Finding no reversible error in any of the numerous assignments of error, we affirm.[1]

Facts
On December 10, 1987, defendant began living at the rectory of a Catholic church whose pastor was Father Patrick McCarthy. Defendant, who was unemployed, and Fr. McCarthy possibly met through defendant's half-brother, Bernard Joseph, a casual visitor to the rectory.
During the eight days defendant lived at the rectory, the church secretary became alarmed and told Fr. McCarthy she was afraid of defendant. Fr. McCarthy consulted with Fr. Oberg, who knew the entire Hamilton family. Fr. Oberg advised Fr. McCarthy that there was no room at Fr. Oberg's rectory and that Fr. McCarthy should not give defendant any money. Following this conversation, Fr. McCarthy made arrangements for defendant to move out on Friday, December 18.
On the morning of December 18, staff members found Fr. McCarthy dead on the floor of the rectory. He was dressed in a robe, and his body was bound with pieces of electrical extension cord, which was also wrapped around his neck. The priest had been stabbed five times in the throat and had been hit eight times in the face, forehead and top of skull with a heavy instrument like a claw hammer.[2] Salt had been poured over his eyes and face and down his throat. The cause of death was strangulation.
Staff members determined that defendant was gone and the parish's vehicle, an unknown amount of money, a television, a VCR and a carpenter's hammer were missing. Defendant's fingerprints were found on a drinking glass in the priest's bathroom, the metal strong box on his desk, and a drinking glass from another upstairs room. Joseph's fingerprints were recovered from the metal strong box, bank envelopes and an empty container of salt found in the kitchen.
The next door neighbor had heard loud noises at the rectory shortly after midnight on the previous evening. She looked toward the rectory and saw nothing unusual, but noted that the parish's vehicle was parked in its usual spot.
About two weeks later, defendant's sister contacted New Orleans police, who recovered from her the television and VCR taken from the rectory. Joseph subsequently surrendered and confessed to the murder.
Believing that defendant had fled the state, local authorities contacted the Federal Bureau of Investigation for assistance. On December 31, 1988, FBI agents apprehended defendant in Texas and found the parish's vehicle. Defendant gave a typewritten statement detailing his participation in the murder of the priest. Pawn tickets, one in defendant's name found in the glove compartment of the parish's vehicle, led to the recovery of two rings belonging to the victim.
*1221 Defendant and Joseph were jointly indicted for first degree murder. When defendant suffered a stroke prior to trial and was ruled incompetent to proceed, the cases were severed.[3]
After defendant recovered from the stroke, the court held a sanity hearing and found defendant able to assist counsel and to understand the proceedings. His pretrial motions to suppress the confession were denied.
The theory of the defense at the guilt phase of trial, in which defendant did not testify, was that the grade of the homicide should be manslaughter because defendant had been badgered and provoked by repeated homosexual advances from the victim.[4] In support of this defense, counsel argued that the victim was naked at the time of his death and emphasized the fact that investigators had found and photographed condoms in the priest's desk. The state pathologist found no medical evidence on the victim's body of anal sex, either recently or of a chronic or recurrent nature.
In his guilt phase closing argument, defense counsel conceded that defendant caused Fr. McCarthy's death, but argued it was peculiar for a priest to have condoms and to receive guests in his room naked. Counsel suggested that homosexual advances were the type of sudden provocation which caused reasonable people to lose self-control and cool reflection.
The jury, after deliberating an hour and thirty-five minutes, found defendant guilty as charged.
In his opening statement at the penalty phase and pursuant to pre-trial notice, the prosecutor announced he would introduce defendant's confession to the unrelated murder of William Chattman in 1986. After introducing all evidence entered in the guilt phase, the prosecutor called the detective to whom defendant had given a typed statement confessing to the 1986 murder of Chattman. The only other witness, a pathologist, testified that "many minutes" went by between the first and last of the injuries to Fr. McCarthy, but that life continued until the end.
The only defense witness at the penalty phase was psychiatrist Chester B. Scrignar. Dr. Scrignar examined defendant and his family history, and reviewed his records from Feliciana Forensic, Charity Hospital, Southeast Missouri Hospital and De Paul Hospital. He believed the probabilities were high that defendant's acts and behavior were affected adversely by the arterial-venous malformation present in his brain since birth. The doctor viewed defendant's early impulse-control *1222 difficulty and behavioral problems, the diagnosis of personality disorder as an adolescent, the grand mal seizure six weeks before the priest's murder, the murder itself, and his subsequent brain hemorrhage and stroke as all parts of one condition. Disagreeing with the psychiatrists who had evaluated defendant and found no mental defect or disease, Dr. Scrignar characterized defendant currently as "mentally impaired and physically impaired in the brain," fitting "the criteria of mental disease."
In closing, defense counsel argued that defendant "is sick ... brain damage[d] and has had mental defects since birth." Counsel stated that the fact defendant murdered before his brain "exploded" with a hemorrhage did not mean that it was not a ticking "time bomb." Counsel admitted his client's killing of Chattman, but argued that defendant had "been declared by this very court to be incompetent to proceed on that murder." Finally, comparing Fr. McCarthy's life and death to that of Jesus Christ, counsel reminded jurors of Christ's last words of forgiveness.
After about two hours of deliberation, the jury requested additional instructions on mitigating circumstances. The court provided further explanation, whereupon the jury resumed deliberation for about another hour. Finding the existence of two aggravating circumstancesthat the offense was committed during the perpetuation of an armed robbery and that the offense was committed in an especially heinous, atrocious or cruel mannerthe jury unanimously recommended the death penalty.

Improper Curtailment of Voir Dire
Defendant alleges numerous errors by the trial judge during jury selection. In particular, defendant asserts he was denied the full voir dire guaranteed by La. Const. art. I, § 17.[5] He claims that problems with courtroom noise, the fast pace of jury selection and limitations on questioning of prospective jurors compromised his trial counsel's ability to make rational decisions on challenges for cause and peremptory strikes.
The scope of voir dire examination lies within the sound discretion of the trial court, and its rulings will not be disturbed on appeal in the absence of a clear abuse of that discretion. Although a court has discretion to restrict voir dire, it must nevertheless afford the attorneys wide latitude in examining prospective jurors as a means of giving effect to an accused's constitutional right to a full voir dire. La. Const. art. I, § 17; La. Code Crim. Proc. art. 786; State v. Maxie, 93-2158 (La. 4/10/95); 653 So.2d 526, 534-535. Thus, while a trial court has control over the scope of jury selection and may limit voir dire accordingly, the limitations may not be so restrictive as to deprive counsel of a reasonable opportunity to determine grounds for challenges for cause and for the intelligent exercise of peremptory challenges. State v. Duplessis, 457 So.2d 604, 606 (La. 1984). In deciding whether a trial court has afforded the defendant sufficiently wide latitude in examining potential jurors, the appellate court should undertake review of the record of the voir dire as a whole. Id.
Defendant complains that noise was a problem during voir dire and that the judge erroneously believed that venire persons seated in the courtroom could hear counsels' remarks and questions, as well as responses by those in the jury box. According to the trial judge, the noise problem was caused by recently installed air conditioning units located outside the courtroom, coupled with poor acoustics. Although the trial judge repeatedly urged everyone to "project" his or her voice, the record does not reflect that any venire persons in the jury box or sitting in the courtroom indicated a problem hearing. Further, the judge asked each subsequent panel called for examination if everyone had heard what had been said previously, and no juror indicated he or she had not heard or had heard poorly.
On this record, defendant failed to establish that the noise level was such as to constitute a denial of due process or prevented the *1223 full voir dire constitutionally guaranteed to the defendant.
As to the pace of jury selection, the twelve jurors and one alternate were selected and sworn before the lunch break, which defense counsel characterizes as an unusually rapid pace for a capital case. However, defendant's trial counsel did not object to the pace of voir dire.
On appeal, new counsel argues the fast pace of jury selection barred defense counsel from probing venire persons on issues pertinent to the proceeding, such as capital punishment, homosexuality, substance abuse, the Fifth Amendment privilege against self-incrimination, the presumption of innocence and pre-trial publicity. Upon review of the record, we note that defense counsel covered these and other pertinent issues such as church affiliation and attendance, the impropriety of a guilty verdict solely to protest against crime, the need for unanimity, and the credibility of police witnesses.[6]
Defendant's primary complaint was that the trial court restricted questioning of venire persons to the point that he was denied the constitutionally guaranteed wide latitude and full examination. Although the trial judge indicated during the examination of the first panel that the attorneys should frame their queries pertaining to the death penalty so jurors could respond with a "yes or no,"[7] the judge did not hold either side to a rigid, inflexible standard. Rather, the judge permitted the attorneys to probe preconceptions, both individually and as a group, as well to conduct in-depth questioning when a juror's views might constitute grounds for disqualification.
Furthermore, it was not unreasonable for the trial judge to direct that the examination of subsequent panels should move more quickly than the first, with the specific exception of questions on capital punishment. Those venire persons subsequently examined were present for the examination of the first panel and thus had heard the attorneys' comments and questions. Although, for purposes of brevity, both sides appropriately adapted by examining subsequent panels of veniremen in the jury box as a group and by asking for raised hands or nods of heads, the defense was still permitted to examine these panelists individually and to revisit critical issues that were presented to the first panel. Moreover, the court permitted closer questioning and repetition during voir dire of the subsequent panels because of the problems with the courtroom acoustics.
Defendant also complains the trial judge personally examined the final six-person panel to select an alternate. Nonetheless, there was no error because the judge thereafter invited and permitted questions from each side.

Admission of Evidence of Unadjudicated Murder
Defendant claims the trial court erred in ruling that his confession to an unadjudicated and unrelated murder was admissible at the penalty phase of trial. He also claims he was incompetent at the time of that confession.
Before trial, the prosecutor gave notice that she would introduce defendant's confession to the unrelated murder of William Chattman. At a hearing outside the presence of the jury shortly before commencement *1224 of the penalty phase, the detective testified that he interviewed defendant on January 21, 1988, while defendant was under arrest for the murder of Fr. McCarthy, about Chattman's 1986 murder. Defendant waived his rights and agreed to talk, making a series of oral admissions followed by a formal statement, in which defendant confessed to killing Chattman. The detective further testified there had been no force, promises, threats or inducements.
The trial court ruled the evidence admissible, finding that the confession was competent and reliable and that the evidence was "clear and convincing" as to defendant's guilt of the unrelated murder. The confession was later read to the jury in its entirety at the penalty phase.
The record does not support defendant's claim that he was incompetent in January of 1988 when he admitted killing Chattman. In fact, in April and May of 1989 he was examined by two court-appointed psychiatrists who found him able to assist counsel and understand the nature and object of the proceedings. No evidence of mental disease or defect was found. Although defendant had a stroke in June of 1988, six months after confessing, nothing in the record shows or suggests he was less than fully competent on January 21, 1988, the date he confessed to shooting Chattman.
The record also supports a further conclusion that the state met its burden to show affirmatively that the confession was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La.Rev. Stat. 15:446; La.Code Crim. Proc. art. 703. The motion to suppress was properly denied.
Admission of the confession into evidence at the penalty phase was also proper. The character and propensities of a defendant convicted of first degree murder are the focus of the sentencing phase of a capital proceeding, whether or not the defendant has placed his or her character at issue. La. Code Crim. Proc. art. 905.2(A); State v. Sawyer, 422 So.2d 95, 104 (La.1982). Evidence of unrelated, unadjudicated crimes may be relevant and probative evidence of a defendant's character and propensities. See State v. Jackson, 608 So.2d 949, 954-956 (La.1992), in which this court limited unadjudicated crimes evidence to "that which involves violence against the person of the victim" and "to that conduct for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for the first degree murder for which he is being tried."
In this case, the unadjudicated offense was a murder, the quintessential crime of violence against the person of the victim. Following a hearing, the trial court found that defendant's connection to Chattman's murder was clearly and convincingly proved, that his confession was otherwise competent and reliable evidence, and that the crime was relevant and substantially probative as to character and propensities under Article 905.2(A).
Defendant's final complaint relating to the evidence of the unadjudicated murder was that its admission violated State v. Bourque, 622 So.2d 198 (La.1993), which prohibited the state from introducing extensive proof at a capital sentencing hearing of the defendant's guilt on unadjudicated and unrelated crimes.
The present case is factually distinguishable from Bourque. In Bourque, the state introduced evidence of an unadjudicated killing, with eleven of the twelve witnesses at the penalty phases testifying exclusively as to the unadjudicated killing. These included four eyewitnesses to the shooting, technicians who testified on the chain of custody of physical evidence gathered at the scene, and the coroner who testified as to cause of death. During the coroner's testimony, an autopsy picture of the victim was introduced into evidence.
Here, there was no "mini-trial" devoted to proving up guilt beyond a reasonable doubt on the unadjudicated murder. The state called one witness, the detective to whom defendant admitted he had shot Chattman, and that witness simply read the confession to the jury. No other evidence was introduced as to the Chattman murder.
The focus of a capital sentencing hearing is the defendant's "propensity to commit first *1225 degree murder...." State v. Jackson, 608 So.2d 949 (La.1992). Relevant to that inquiry is the defendant's commission of other serious crimes of violence against the person. Bourque does not purport to prohibit the admission of a capital defendant's confession to an unadjudicated crime otherwise admissible under Jackson.
The state's presentation of minimal evidence of an unadjudicated murder was scarcely designed to shift the jury's attention from its primary responsibility to determine an appropriate punishment for his murder of Fr. McCarthy, nor would it have reasonably have done so in this case.

Prosecutor's Comment on Defendant's Failure to Testify
Defendant complains of prosecutorial misconduct during the penalty phase argument. Counsel particularly argues that the prosecutor's reference on two occasions that defendant showed "no remorse" constituted impermissible comments on defendant's failure to testify in violation of La.Code Crim. Proc. art. 770(3).
The complaint relates to the following passage from the prosecutor's penalty phase closing argument:
We're going to try to give you all the information we can so that you can make a good decision and you can make a just decision. That's all we can ask for.
And we brought to you evidence, good and competent and reliable evidence about another murder. Marcus Hamilton has taken another person out of his life, and you heard his own confession.... No remorse shown.

It happened in March of 1986. This was before he killed Father McCarthy. He planned the murder. He got a gun, he shot someone while they were lying on the sofashot him in the headtook property from him, and left. After that, he killed Father McCarthy.
He has no remorse, no sorrow for that crime. After his first murder, he committed another murder, the murder you sat on as jurors. That's what kind of character; those are his propensities. His propensity is to kill people. That's what that person is there. And that's why I think when I stand here, I said I'm disturbed. We're talking about somebody who kills people and what to do with somebody like that. (emphasis added).
A mistrial shall be ordered when the prosecutor refers directly or indirectly to the failure of the defendant to testify in his own defense. La.Code Crim. Proc. art. 770(3). The question in the present case is whether the prosecutor's comment was an indirect reference to the defendant's failure to testify. An indirect reference requires mistrial only if the court determines that the comment was intended to draw the jury's attention to the failure to testify. State v. Johnson, 541 So.2d 818, 822 (La.1989).
First, there was no objection to the comment; therefore, defense counsel did not recognize the comment as an attempt to draw the jury's attention to defendant's failure to testify. Moreover, evidence that a capital defendant showed no remorse does not inject arbitrariness into the proceedings, as a lack of remorse is "relevant to the character and propensities of the defendant." State v. Wilson, 467 So.2d 503, 523 (La.1985). Finally, defendant was not the only person who could have testified that defendant showed remorse for his crimes, and the prosecutor's comment on the lack of remorse could not reasonably be characterized as an effort to call to the jury's attention the failure of defendant to testify in his own defense.

Expert's Opinion of Heinousness of Offense
Defendant contends his death sentence must be vacated because a state witness was allowed "to characterize the murder of Fr. McCarthy as heinous, atrocious and cruel." The claim refers to the testimony of the pathologist who, when asked if the priest's death was heinous, atrocious or cruel within the common meaning of the phrase, testified that, as he understood the phrase, he would answer affirmatively. He based his answer on the extent, nature and variety of the injuries, as well as the period of time that it would require to inflict the injuries, noting that "life continued until the end."
*1226 The question and answer were improper. The state predicated its request for the death penalty on two statutory aggravating circumstances, one of which was that the "offense was committed in an especially heinous, atrocious or cruel manner." La.Code Crim. Proc. art. 905.4A(7). The prosecutor's incorporating the statutory language into her question, in order to elicit the expected response from the doctor, was a transparent attempt to influence the decision jurors would be called upon to make as to the existence of that aggravating circumstance. The doctor was not stating a medical opinion, but was drawing a legal conclusion that was within the jury's province.
Whether the state established beyond a reasonable doubt that the murder was "committed in an especially heinous, atrocious, or cruel manner" was for the jury alone to determine. Moreover, this was an issue for which no expert opinion was needed. The pathologist's opinion that the murder of Fr. McCarthy was heinous, atrocious and cruel, which did not depend on the doctor's medical expertise, was therefore irrelevant.
Nevertheless, the viciousness and brutality of the killing, as reflected in other properly admitted evidence, reduced the risk that the doctor's testimony actually influenced the jury or contributed in any substantial way to its decision to find this an "especially heinous" murder. Moreover, that testimony did not inject an arbitrary factor into the proceedings. Evidence of the extent and order of injuries, inflicted over a substantial period of time, was sufficient to convince a rational trier of fact of the existence of torture and pitiless infliction of pain and suffering. The "especially heinous" statutory aggravating circumstances were proved beyond a reasonable doubt.
Moreover, even if the pathologist's opinion tainted the jury's finding of heinousness, the jury's additional (and fully supported) finding of a second aggravating circumstance (killing during the perpetration of an armed robbery) independently supported its sentencing recommendation. See State v. Davis, 92-1623 (La. 5/23/94); 637 So.2d 1012; State v. Wille, 559 So.2d 1321, 1341, n. 16 (La.1990).

Especially Heinous Manner as an Aggravating Circumstance
Defendant contends the "especially heinous" aggravating circumstance returned by his jury is unconstitutional. He argues the circumstance is overly broad, facially vague and deficient under Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Additionally, defendant argues that the jury was not aware an "especially heinous" finding must rest upon proof of torture or the pitiless infliction of pain and suffering, because the trial judge did not give a limiting instruction.
This court has upheld the constitutionality of the "especially heinous" aggravating circumstance against claims it is vague and overly broad. State v. Clark, 387 So.2d 1124, 1132-1133 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 830 (1981). Moreover, this court has applied a narrowing construction and held that a jury may find a murder "especially heinous" only upon proof beyond a reasonable doubt that the defendant engaged in torture of the victim or pitiless infliction of unnecessary pain and suffering. See State v. Sonnier, 402 So.2d 650, 659-660 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983).
The Maynard decision did not change this analysis. As the court made clear in State v. Wille, 559 So.2d 1321, 1336 (La.1990):

Maynard, however, does not preclude the application of this aggravating circumstance with a limiting construction, which permits the jury to distinguish those types of murders which qualify as being committed in an especially cruel, heinous or atrocious manner and those which do not. In fact the United States Supreme Court recognized that one limiting construction which has been employed by other states is the requirement of torture or serious physical abuse, and it implicitly approved that limiting construction by noting that `[w]e also do not hold that some kind of torture or serious physical abuse is the only limiting construction of the heinous, atrocious, or cruel aggravating circumstance *1227 that would be constitutionally permissible.' (emphasis in original).
The fact that the jury was unaware of the narrow construction to be given the "especially heinous" aggravating circumstance did not result in any prejudice to defendant's substantial rights or deprive him of a reliable sentencing determination.[8] There was ample evidence of torture and pitiless infliction of pain and suffering. The pathologist described eight separate wounds to Fr. McCarthy's face and skull, done with a blunt heavy instrument like a hammer with enough force to fracture the underlying bone. The victim was tied and bound, and a cord was wrapped around his neck. He was stabbed five times in the throat, with some wounds reaching his spinal column. These injuries were not immediately fatal, nor did they necessarily cause unconsciousness. Defendant and Joseph then pulled on opposite ends of the heavy electrical cord wrapped around the victim's neck. At least according to defendant's confession, two tries were required to complete the strangulation, each of several minutes duration with a rest in between. Finally, salt was poured over the priest's wounds and down his throat. From the position of his tongue with reference to the passage of salt down the throat, the pathologist concluded that the victim remained alive to the end. Although his larynx was damaged, he would have been able to call out or yell for help. The coarse twine wrapped around his jaw and head, which held a bloody pad next to his mouth, may have muffled any cries.
The issue is not close. The victim suffered gross physical abuse. The death was accomplished in an inhuman, particularly painful manner, and he died while being tormented and tortured. The evidence was sufficient to support a finding the murder was "committed in an especially heinous, atrocious or cruel manner."

Improper Jury Instructions
Defendant first complains the trial court failed to instruct the jury on the presumption of innocence as to the unadjudicated murder, as required by State v. Bourque, 622 So.2d 198 (La.1993).
In Bourque, the court articulated policy reasons for its decision to prohibit a "minitrial" of the accused's guilt of unadjudicated and unrelated crimes at a sentencing hearing. One reason given was an accused's presumption of innocence. While the Bourque decision states that a capital defendant is entitled to the presumption of innocence as to unadjudicated crimes, it does not purport to require a jury instruction to that effect, and the defense did not request such an instruction in this case. Bourque is not authority for arguing that a failure to give such an unrequested charge violates due process.
Defendant's next argument pertains to the "weighing" of statutory aggravating and mitigating circumstances. Defendant contends that the judge incorrectly instructed the jury to weigh the mitigating circumstances against the aggravating circumstances.
Louisiana is not a "weighing" state. Louisiana has no requirement for the balancing of aggravating and mitigating circumstances. La.Code Crim.Proc. art. 905.3;[9]State ex rel. Busby v. Butler, 538 So.2d 164, 173-174 (La.1988); State v. Jones, 474 So.2d 919, 932 (La.1985); State v. Flowers, 441 So.2d 707 (La.1983).
In a non-weighing state such as Louisiana, the failure of one aggravating circumstance does not invalidate a death sentence so long as another aggravating circumstance has been proved beyond a reasonable doubt and the introduction of evidence on the invalid *1228 aggravating circumstance does not inject an arbitrary factor into the proceedings. State v. Wille, 559 So.2d 1321, 1341, n. 16 (La.1990), citing Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); State v. Jones, 474 So.2d 919 (La.1985).
Defendant argues that because the judge instructed the jury to weigh the aggravating circumstances against the mitigating circumstances, the jury weighed the "especially heinous" aggravating circumstance, which defendant contends was invalid. Defendant accordingly contends that the judge's error in instructing the jury to weigh that invalid aggravating circumstance cannot be harmless. The premise of the defendant's argument, however, is faulty. Defendant bases his argument on a colloquy between the trial court and a juror, at a point when the jury interrupted deliberations to request a further instruction on mitigating circumstances. Review of that colloquy reveals no support for defendant's claim that the judge instructed the jury to weigh aggravating circumstances against mitigating circumstances.[10]
Defendant finally contends that the trial court failed to charge the jury on the role of statutory aggravating and mitigating circumstances and failed to instruct the jury that it was not to view negatively defendant's failure to testify, that a mitigating circumstance need not be found beyond a reasonable doubt or unanimously, and that it is not obliged to return the death penalty. He also complains that the jury was charged on all statutory mitigating factors.
The trial court's charge in its entirety correctly set out Louisiana's capital sentencing provisions and properly instructed the jury with respect to the sentencing decision it was to make. There was no error in charging on all statutory mitigating factors. Moreover, while a jury is never obliged to return the death penalty, there is no general requirement to so charge. See State v. Martin, 550 So.2d 568, 573-574 (La.1989). Defendant might have had a valid basis for requesting special instructions on a number of points he now raises, but counsel neither submitted any special jury charges nor objected to their absence.

CAPITAL SENTENCING REVIEW
La.Code Crim. Proc. art. 905.9 and La. Sup.Ct. R. 28 require this court to review every sentence of death to determine if it is constitutionally excessive. In making this determination, the court considers whether the sentence was imposed under the influence of passion, prejudice or arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate considering both the offense and the offender.
Defendant is a black male who was thirty years old at the time of commission of the offense. While technically a first felony offender, evidence at trial established his culpability in an unrelated murder. He had several arrests, as well as misdemeanor convictions for marijuana possession, carrying a concealed weapon and criminal damage to property.
According to information he supplied for the pre-sentencing investigation report, defendant was born in New Orleans and has four brothers and seven sisters. He attended public schools and received a G.E.D. He claims to have served in the United States Army before being dishonorably discharged following an arrest for possession of hashish. Defendant admitted heavy cocaine use from 1986 to 1988. He suffered a stroke in 1988.
He exhibited no remorse for his conduct. In discussing the priest's murder with the *1229 investigator, he stated, "[t]he bitch deserved to die."
The victim was a white male who was thirty-seven years old at the time of his death. He had allowed the unemployed defendant to use a spare bedroom at the rectory. Race was not a factor in the murder.
The defense urged two statutory mitigating circumstancesthat the offense was committed while defendant "was under the influence of extreme mental or emotional disturbance," and that at the time of the offense, defendant's "capacity ... to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect...." La.Code Crim. Proc. art. 905.5(b) and (e). Support came from the penalty phase testimony of Dr. Scrignar.
The defense theory of the case was that defendant was provoked by the victim's homosexual advances so as to reduce the degree of the crime to manslaughter. The defense also argued he was "the sickest of the sick" and that his mental condition merited a life sentence. The presiding judge commented:
In the opinion of this court, the death penalty should be reserved for those cases... in which special circumstances of particular cruelty admit of no lesser punishment. This is one of those cases, perhaps the most compelling this judge has seen in over two decades of involvement with the criminal justice system. The defendant admits openly that he murdered Father McCarthy and shows no remorse whatsoever for his actions, justifying them on the grounds that the priest made a homosexual advance to him. Even if the truth of this matter were conceded (and this court regards it as an infamous lie) such an action would excuse nothing whatsoever. Marcus Hamilton was a large, muscular man, Father McCarthy a small one; Father McCarthy would have been utterly unable to force his attentions on anyone. Secondly, such an action would not have justified anything beyond minimal force, much less a murder committed under such horrifying circumstances. Thirdly, the fact that the prolonged torture and murder was incident to robberygives the lie to any `justification' Marcus Hamilton might give.

Aggravating Circumstances
The prosecutor argued two aggravating circumstances: that the murder was committed during an armed robbery and that it was committed in an especially heinous, cruel or atrocious manner. The jury returned both, and both are adequately supported.
The evidence demonstrated that defendant and his brother ransacked the upper floor of the rectory and removed money, a VCR, television set, a vehicle and jewelry, including one ring which had been a gift from the victim's mother and which he never removed. While the precise sequence of events is unclear, the torture and killing of Fr. McCarthy, including the hammer blows to the head, occurred during the same criminal episode or transaction as the robbery. A rational juror, viewing the evidence in the light most favorable to the state, could have found beyond a reasonable doubt the murder occurred during an armed robbery. State v. Captville, 448 So.2d 676 (La.1984).
The evidence also supported the jury's finding that the murder was committed in an especially heinous, cruel and atrocious manner.

Arbitrary Factors
Defendant argued that a number of matters injected arbitrary factors into the proceedings. All claims lacked merit, as discussed hereinabove, except the state's obvious attempt to influence the jury's decision regarding the "especially heinous" aggravating circumstance by eliciting expert testimony from the pathologist regarding the heinous, cruel and atrocious manner in which the crime was committed. The error was harmless, however, because of the wealth of other properly admitted evidence establishing that the victim was tortured unmercifully.

Proportionality
Federal constitutional law does not require a review for proportionality. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 *1230 L.Ed.2d 29 (1984). Nevertheless, comparative review is still a relevant consideration in determining the issue of excessiveness. State v. Kyles, 513 So.2d 265, 276 (La. 1987).
The state's Sentence Review Memorandum lists twenty-eight cases from Orleans Parish in which the death penalty has been imposed. Ten involved murders committed in an especially heinous, cruel or atrocious manner, and sixteen involved murders during an armed robbery. While none involved death by strangulation, several involved multiple stab wounds. See State v. Monroe, 397 So.2d 1258 (La.1981) (the defendant broke into the victim's home, stabbed the victim seven times as well as stabbed the victim's eleven-year-old daughter in the back); State v. Brown, 514 So.2d 99 (La.1987) (multiple stab wounds during an armed robbery); and State v. Deboue, 552 So.2d 355 (La.1989) (brutal slashing of the throats of two children who lived for some twenty-five minutes while losing blood).
The case of State v. Eaton, 524 So.2d 1194 (La.1988), which arose in Rapides Parish, most closely resembles this case. In Eaton, the defendant killed a female minister to steal her car for a trip to Florida. Armed with a length of pipe and hiding behind some bushes near the parking lot of the church, defendant attacked the minister when she came out to her car, hit her in the head, stabbed her twenty-six times, and then drove off with her body, dumping it outside town.
At trial, a psychiatrist testified the defendant had a personality disorder, but no overt mental illness. Defendant's father testified his son "never has shown a moment's worth of sorrow since it happened."
Eaton was nineteen years old and had no serious criminal history. He had an IQ of about seventy, placing him in the upper limit of mild retardation. In this case, defendant was thirty, technically a first-felony offender, and was not retarded. Mental disorders or defects short of insanity were urged in each case. Of the two, defendant had the more extensive history of emotional and mental disturbance. Neither expressed or exhibited remorse for their victims. Both victims were members of the clergy. Each of the victims experienced horrible injuries whose sheer number suggest they were inflicted over some period of time. When compared with Eaton, it cannot be said that defendant's sentence of death is disproportionate.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La.Rev.Stat. 15:567, until: (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, the defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
NOTES
[*] Judge Lemmie O. Hightower, Court of Appeal, Second Circuit, sitting by assignment in the vacancy created by the resignation of Dennis, J., now a judge on the United States Court of Appeals for the Fifth Circuit. Watson, J., not on panel. Rule IV, Part 2, § 3.
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is a part of the official record. [Editor's Note: Appendix is not included for publication.]
[2] The injuries had been inflicted in the following order: first the blows to the head and skull, then the tying and binding; next the cord was wrapped around the neck, followed by the stab wounds to the throat; then came the salt; finally, the strangulation was accomplished by pulling tightly on the two loose ends of the extension cord wrapped around the neck.
[3] Bernard Joseph, nineteen years old at the time of the crime, was found guilty of first degree murder in an earlier trial, but the jury could not agree on punishment. Hence, he was sentenced to life imprisonment. State v. Joseph, 573 So.2d 1248 (La.App. 4th Cir.), cert. denied, 577 So.2d 31 (La.1991).
[4] The homosexual theme arose in defendant's confession, which was read in its entirety to the jury. In it defendant stated that the priest "put his hands on me every time I got near him" and kept asking defendant to sleep in his room.

On the evening of December 17, according to the confession, defendant and Joseph had dinner with Fr. McCarthy, who retired early. Defendant told Joseph that if the priest did not leave him alone, he would "have to hurt him, and if I hurt him I would have to kill him." Joseph ostensibly left, but actually remained while defendant brought the house keys to the priest, who was lying in bed, naked. The priest suggested that defendant shower and then join him in bed. Defendant, knowing "right then and there [that he] was going to hurt the man," thought about leaving but instead walked over and began hitting the priest with his fist and a hammer he had carried to the bathroom. Although defendant hit him hard, the priest did not pass out, but "just rolled out of bed and said he wanted his robe, that he was cold." Defendant said all he wanted to do "was knock him out and take his truck."
The priest told defendant he would tell people he had fallen and would get defendant a plane ticket, stating that there was money in a dresser drawer they could have. They found about $80 in one-dollar bills in the dresser, but were afraid the priest would call the police and report the robbery.
Defendant and Joseph "decided the easiest way out of it would be to choke him." They got the extension cord, wrapped it twice around the priest's neck and "pulled hard for a long time," perhaps ten minutes. When Fr. McCarthy was still "trying to breathe," Joseph stabbed him about four times in the throat. Then they pulled on the ends of the extension cord "really hard" for about fifteen minutes. Joseph got some salt and poured it all over the priest. When Fr. McCarthy seemed to be dead, they "took some things" from the rectory and left in the parish's vehicle.
[5] La. Const. art. I, § 17 addresses jury trials in criminal cases and guarantees that "[t]he accused shall have the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily...."
[6] The defense had access to information about prospective jurors prior to the start of voir dire, probably from juror questionnaire forms. For example, counsel knew without asking that a particular juror had one child and that another was employed as a teacher. With such information in hand, counsel could, as both defense attorneys generally did, focus on legal issues and on whether jurors could contemplate both death and life as viable sentences.
[7] The prosecutor asked one juror whether she was "in favor of capital punishment?" The defense objected that the issue was whether she could "consider" both death and life imprisonment as possible sentences. The trial judge responded this way:

Well, Iladies and gentlemen, I try and aim voir dires at Yes or No questions, soand I don't want ever to put anybody on the spot and get a metaphysical argument for or against something as controversial as the death penalty, so [ADA], ask Yes or No questions, alright? And I'm not interestedit's not that I'm not interested but we don't have time to take each person and get a background of their feelings on the death penalty. We just don't have the time. So [ADA], give them Yes or No questions, alright?
[8] There was no defense request that jurors be given a limiting instruction on the "especially heinous" aggravating circumstance.
[9] La.Code Crim. Proc. art. 905.3 provides:

A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, determines that the sentence of death should be imposed. The court shall instruct the jury concerning all of the statutory mitigating circumstances. The court shall also instruct the jury concerning the statutory aggravating circumstances but may decline to instruct the jury on any aggravating circumstance not supported by the evidence. The court may provide the jury with a list of the mitigating and aggravating circumstances upon which the jury was instructed.
[10] The trial court's general charge correctly informed the jury that a sentence of death could not be imposed unless it found unanimously and beyond a reasonable doubt the existence of a statutory aggravating circumstance and that it thereafter may consider imposing a sentence of death, but must also consider any mitigating circumstances before deciding whether a sentence of death should be imposed.

In response to a question during the additional instruction, the court told the jury that it could consider defendant's mental capacity at the time of the crime, but declined to tell the jury whether to or how to weigh that factor as a mitigating circumstance.