STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 08-687


STATE OF LOUISIANA

VERSUS

CLYDE MILTON JONES


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 5693-06
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of John D. Saunders, Billy Howard Ezell, and J. David Painter, Judges.


**AFFIRMED.**


**John Foster DeRosier**
**Fourteenth Judicial District Court District Attorney**
**Carla Sue Sigler**
**Assistant District Attorney**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Peggy J. Sullivan**
**La Appellate Project**
**P. O. Box 2775**
**Monroe, LA 71207-2775**
**(318) 387-6124**
**Counsel for Defendant/Appellant:**
**Clyde Milton Jones**

**EZELL, JUDGE.**

Defendant, Clyde Milton Jones, was indicted on February 16, 2006, for second degree murder. On January 15, 2008, the State filed "Notice of Intent to Use Evidence of Other Crimes." A hearing was held on January 23, 2008, wherein the trial court heard arguments as to whether it should admit the other crimes evidence. Trial commenced on February 27, 2008, and continued until March 5, 2008. Defendant was found guilty as charged.

Defendant filed a "Motion [for] Judgment of Acquittal" and a "Motion for New Trial" on March 12, 2008. The motions were heard on the same date and denied. After waiving the time delay as required by La.Code Crim.P. art. 873, Defendant was sentenced to life imprisonment.

Defendant has perfected a timely appeal. He asserts as assignments of error: 1) The evidence as a whole was insufficient to support a conviction for second degree murder; 2) The trial court erred in allowing Detective Gregory Kellogg to testify repeatedly as to hearsay evidence over defense counsel's objections; 3) The trial court erred in allowing the introduction of testimony regarding other crimes evidence (Prieur); and 4) The trial court erred in refusing to allow defense counsel to elicit detailed testimony regarding other suspects in the investigation, namely Chad Eaton.

For the following reasons, Defendant's conviction of second degree murder is affirmed.

## FACTS

Defendant and two cohorts, Michael Rogers and Jerrod Furlough, began a crime spree in Houston, Texas on or about June 4, 2003. While continuously smoking marijuana and ingesting PCP and Xanax, the three robbed several persons using a gun over the next three days. The crime spree ended in Lake Charles,

1

following the robbery and shooting of the Victim, Gregory Fontenot, in the early morning hours of June 7, 2003. The Victim died as a result of the gunshot wounds.

**ASSIGNMENT OF ERROR NUMBER ONE**

Defendant argues that the evidence was insufficient to sustain the verdict of guilty of second degree murder. He contends that there was no physical evidence placing him at the crime scene and that the testimonies of his co-perpetrators, both of whom testified it was Defendant who robbed and shot the victim, were self-serving, inconsistent, and contradictory.

With regards to insufficient evidence, this court has stated:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559, (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). The role of the factfinder is to weigh the respective credibility of each witness. Therefore, the appellate court should not second guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559, citing *State v. Richardson,* 425 So.2d 1228 (La.1983).

*State v. Miller,* 98-1873, p. 5 (La.App. 3 Cir. 10/13/99),746 So.2d 118, 120, *writ denied*, 99-3259 (La. 5/5/00), 761 So.2d 541.

Second degree murder, in applicable part, is defined as the "killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm; or (2)(a) When the offender is engaged in the perpetration or attempted perpetration of . . . .armed robbery" La.R.S. 14:30.1.

Three witnesses, Troy Martin, Kenneth Bordelon, and Richard Land, whose homes bordered Prejean Park, formerly known as Brentwood Park, in Lake Charles, testified at trial. Mr. Martin testified that at approximately 7:00 on the morning of

2

June 7, 2003, he saw a black Isuzu Rodeo with Texas plates drive rapidly out of the park. He stated there were three black males in the vehicle. He testified that the driver was light-skinned and wearing a blue baseball cap turned backwards. He did not see the individual in the courtroom. Kenneth Bordelon was in his back yard on the morning of June 7. He testified that at approximately 6:45 a.m., he heard three gunshots. He looked over his back yard fence and saw a black Isuzu Rodeo driving out of the park. Richard Land testified that he was taking an early morning run on the track in Prejean Park when he noticed a young, black male lying in the grass. He determined the man was dead and called the authorities. Prior to seeing the body, he saw an SUV driving out of the park. He saw no other people or vehicles in the park.

It was soon discovered that the deceased was Gregory Fontenot. Delisa Malveaux, the Victim's sister, testified that she last saw the Victim at 5:30 a.m. on June 7, 2003. She stated that he had borrowed her car the night before and was returning the vehicle. He asked if he could keep the car longer to go and visit his girlfriend who lived at the Johnson Hall apartments. However, Malveaux said no and reclaimed the car keys. She stated that the prior evening she, her husband Darrell Malveaux, and the Victim had gone to the mall where the Victim purchased a pair of black tennis shoes of the brand, "Fila." She testified that when she saw her brother that morning, he was wearing the black Filas, a gold chain and medallion, a gold Seiko watch, and a blue baseball cap that he always wore backwards. At trial, she identified a gold Seiko watch, a pair of black Filas, and a blue baseball cap as being very similar to the items the victim wore the last time she saw him.

Gregory C. Kellogg, a detective with the Calcasieu Parish Sheriff's Office, Violent Crimes Investigation Unit, testified that he was called early June 7 regarding a shooting in Prejean Park. Detective Kellogg was the lead investigator in the case.

3

When he arrived at the scene, he found a young, black male, who had been shot twice, once in the chest and once in the head. A bullet was located on the ground under the man's head. He stated that the man wore only white socks on his feet. His shoes were not located. The police were able to identify the man by a tattoo on his neck. The Victim had been in the Calcasieu Correctional Center at one time, and they had a picture of the tattoo on file. Detective Kellogg stated that after they canvassed the neighborhood and spoke with Land, Martin, and Bordelon, and because of the information given to him, he put out a "be on the look out" for a black Isuzu Rodeo. He said that he then spoke with the Victim's parents, Patrick and Sheila Harrison, and they directed the detective to the Victim's sister, Delisa Malveaux, who had advised him what the Victim was wearing when she last saw him.

The detective testified that Defendant was wearing a pair of new, black Filas and a gold Seiko watch when he was arrested in Houston five days later. Defendant had told the detective that he had sold the medallion to someone.

The black Isuzu Rodeo was discovered the next day parked at an abandoned house in Lake Charles. Detective Kellogg stated that the VIN number on the vehicle did not match the license plate number, and it was also determined that the Isuzu had been carjacked in Houston a few days earlier. There was a wallet found in the Isuzu that belonged to Wade Oliphant, from Texas City, Texas, and an insurance card from Sandra and Eddie Sessum from Katy, Texas. It was determined that Eddie Sessum was the owner of the Isuzu. Defendant's, Rogers', and Furlough's fingerprints were later found in the Isuzu. Shortly after the discovery of the Isuzu, Detective Kellogg received a phone call from the Victim's parents advising him that the gun that was used to shoot their son may have been recovered.

4

Jeffery Celestine, a friend of the Victim, testified that he had heard the shooters were in a black Isuzu and knew that Rogers had been seen that morning in a black Isuzu. He went to Rogers' house and managed to get the gun. He took it to the Victim's father, who then called the police. The gun was an S-43, Ruger P85, 9 millimeter, and was later determined through ballistics testing that the gun was the one that killed the Victim.

At this time, the police went to Rogers' home and arrested him under suspicion for the shooting of Gregory Fontenot. Furlough was with Rogers at the time and was subsequently arrested. The two men eventually confessed they witnessed the robbing and killing of the Victim and named Defendant as the shooter.

Michael Rogers, who by the time of Defendant's trial had pled guilty to manslaughter for his involvement in the death of the Victim, testified that he met Defendant, "C.J.," in Pasadena, Texas. He said that he purchased drugs from Defendant and eventually they became drug buddies, smoking marijuana, and ingesting PCP and Xanax, or "Xanbars." About a week before the shooting, Rogers, together with his cousin, Jerrard Furlough, nicknamed "Pooh," and Defendant went on a crime spree. The witness described several robberies that involved the gun, which he claimed belonged to Defendant, including the robbery and carjacking of a white Ford Taurus. The next night, the three drove around Houston in the Ford Taurus smoking marijuana and ingesting drugs. The witness stated that he fell asleep, and when he woke up, Pooh was driving the Ford Taurus and Defendant was following behind in a black Isuzu Rodeo.

The following night the two cousins decided to return to Lake Charles and invited Defendant to go with them. Rogers described how, as the three were pulling out of the parking lot of the apartment building where they had been staying, they

5

robbed another person at gunpoint and attempted to carjack his car, but there were too many keys on the key ring and they could not figure out which key turned on the car. He stated they left Texas after midnight and arrived in Lake Charles around 4:00 a.m. He stated they went to a night club called "Poonie's," then to a gas station and purchased cigars, and then to his mother's house. They dropped off their stuff, left, and went to a car wash. After they washed the car, they ran into the Victim on a street corner. The Victim was driving a car, but he asked them if they would drive him to Johnson Hall. Rogers testified that he knew the Victim because he was a good friend of his brother. Although he had agreed to drive the Victim to Johnson Hall, Rogers stated he went home instead. However, the Victim followed him home. They then followed the Victim to his sister's house where he dropped off the car he was driving, and all four got into the Isuzu.

Rogers testified that he was driving down Louisiana Avenue toward Johnson Hall when he heard Defendant, who was in the back seat with the Victim, cussing. The Victim had passed out and his head was on Defendant's shoulder, and the Victim was bleeding from the mouth. Rogers pulled off Louisiana Avenue and looked for a place to stop that would not be conspicuous because he was driving a stolen car. At the park, Rogers said he tried to wake the Victim up. The Victim woke up, however, when Defendant pulled the gold chain and medallion over his head. The Victim cried, "Man, I know you ain't trying to rob me." The Victim and Defendant got out of the car and a pushing match ensued. Defendant pulled out the gun and fired two shots at the Victim. Rogers testified that he watched Defendant remove the Victim's shoes. He jumped back into the Isuzu, and as they were driving away, Defendant fired a third shot out the window at the Victim, stating that they could not leave the Victim alive. Rogers said they went back to his house, where they

6

showered and prepared to take Defendant back to Houston. As they waited to leave, three of Rogers' friends came to the house. After Defendant, Rogers, and Furlough left, they stopped at Rogers' girlfriend's house, and he told her that he was taking Defendant back to Houston.

Rogers testified that after they got back to Houston and dropped Defendant off at his house, Defendant told him that he had left the gun in Lake Charles under his bed. He stated that when he and Furlough arrived back in Lake Charles, he ran into a friend who told him about the Victim's death and that the police were looking for a black Isuzu, like the one he was driving. He testified that he and Furlough dropped the vehicle off at an abandoned place on Knapp Street and wiped the Isuzu down in an attempt to get rid of prints.

Rogers testified that after they got back to his mother's house, he told Furlough to get rid of the gun, but the next day the gun was still in his room. He said that the same day, Jeffery Celestine came over to his house and, while they were in his room, saw the gun. He said that Celestine wanted to buy the gun, but he told him to come back later. Celestine did come back later in the day with another friend, Dion. Rogers said Dion smelled the barrel of the gun asked if it had been fired recently. "So I told him--I told him, 'Yeah, it'd been fired,' and he said, 'When?' I said 'A couple days ago,' So he--he told me --he said, 'That looks like the gun that killed my home boy.'" Celestine and Dion left the house with the gun in their possession. The same day, the police arrested Rogers and Furlough.

Jerrard Furlough testified at Defendant's trial. He had also pled guilty to manslaughter prior to Defendant's trial because of his involvement in the Victim's death. He had met Defendant a few weeks before the shooting. He described several of the robberies he, his cousin, and Defendant committed in Houston a few days prior

7

to driving back to Lake Charles. He described how he and Defendant carjacked the Isuzu Rodeo. They were in the Ford Taurus in a Jack-in-the-Box drive through when Defendant spotted the black Isuzu parked in the parking lot. Furlough testified that Defendant jumped out of the car and pulled the gun and demanded money and keys from the man sitting in the Isuzu. Furlough's testimony essentially corroborated Rogers' testimony up to and including the shooting of the Victim.

While Defendant did not testify, a video tape of his interview with the police following his apprehension was played for the jury. A transcript of the interview was also admitted into evidence. Defendant admitted he went to Lake Charles with Rogers and Furlough. He denied the robberies prior to leaving Houston. He said that Pooh told him the Isuzu belonged to a relative. He said that on the way to Lake Charles he fell asleep and did not wake up until they arrived at Pooh's mother's house, where he promptly fell asleep on the couch. He woke later in the morning when Pooh and Rogers came into the house all hopped up, and they starting pulling stuff out of their pockets, including a chain with a medallion and a gold watch. He said he asked if he could buy the chain for four hundred and fifty dollars, and they agreed and threw in the watch. He said he had a bad feeling about everything and told them he wanted to go home, that he was homesick. Defendant insisted he was back in Houston at his girlfriend's house by 4:30 a.m. that same morning. Defendant said he learned about the murder, stating that Pooh told him he "popped" someone, but he was unclear about when Pooh told him, at the time they returned with the jewelry, or after they dropped him off in Houston.

In brief, Defendant argues that there was no physical evidence placing him at the scene of the shooting. He points out that the gun was found in Rogers' possession. He argues that there was no positive evidence that the black Filas he was

8

wearing had belonged to the Victim and was a common item, as was the gold Seiko watch he was wearing when he was apprehended.

However, Defendant admitted he was in Lake Charles on the morning of the Victim's death. Fingerprints put him in the Isuzu along with Rogers and Furlough. He was apprehended wearing a Seiko watch very similar to the watch missing from the Victim's body. He also admitted he had possession of a gold chain and medallion similar to the gold chain and medallion the Victim was wearing, although he stated the medallion was not the same as the one in the picture the officer showed him. In his statement, he indicated that the items were taken from the man that Pooh "popped." Furthermore, he was apprehended wearing new black Filas, exactly like the ones missing from the Victim's feet.

Finally, Defendant's two cohorts, Rogers and Furlough, testified that they watched Defendant rob and shoot the Victim. While accomplice testimony should be approached with caution, the Louisiana Supreme Court in *State v. Hughes,* 05-992, p. 6 (La. 11/29/06), 943 So.2d 1047, 1051, stated:

> [I]n Louisiana, an accomplice is qualified to testify against a co-perpetrator even if the State offers him inducements to testify. [*State v.*]*Neal,* 00-0674 at p. 11 [(La.6/29/01)], 796 So.2d [649] at 658. The inducements would merely affect the witness's credibility. *Id*. at p. 12, 796 So.2d at 658. Additionally, a conviction may be sustained on the uncorroborated testimony of a purported accomplice, although the jury should be instructed to treat the testimony with great caution. *State v. Tate*, 01-1658, pp. 4-5 (La.5/20/03), 851 So.2d 921, 928. When the accomplice's testimony is materially corroborated by other evidence, such language is not required. *Id*.; *State v. Castleberry*, 98-1388, p. 13 (La.4/13/99), 758 So.2d 749, 761. An accomplice's testimony is materially corroborated "if there is evidence that confirms material points in an accomplice's tale, and confirms the defendant's identity and some relationship to the situation." *Castleberry*, 98-1388 at p. 13, 758 So.2d at 761 (quoting *State v. Schaffner,* 398 So.2d 1032, 1035 (La.1981)).

9

Furthermore:

> An accomplice is a competent witness to testify against his co-perpetrator even if the prosecution offers him inducements to testify; those inducements only affect the witness's credibility. *State v. Jetton,* [32,893 (La.App. 2 Cir. 4/5/00), 756 So.2d 1206], writ denied, 00-1568 (La. 3/16/01),787 So.2d 299, and cases cited therein. The credibility of a co-defendant's testimony is not within the province of the court of appeal to decide. *Id.* Rather, credibility evaluations are well within the province of the trier of fact. *Id.*

*State v. Bonner,* 39,187, p. 6 (La.App. 2 Cir. 12/22/04), 895 So.2d 1, 5, *writ denied*, 06-1490 (La. 3/9/07), 949 So.2d 435.

In *Bonner*, the accused was found guilty of second degree murder of a cab driver. His accomplice, Hobbs, testified for the State. Bonner argued insufficient evidence to support the conviction, contending that all the physical evidence pointed to Hobbs as the shooter. "The pistol was pawned by him, his fingerprint was found on the victim's papers, and (despite his version of events), his voice was identified as the person who called the cab to the One Stop." *Id.* at 5. Moreover, Hobbs had received a deal from the State in exchange for his testimony. Agreeing that Bonner had some strong arguable points, the second circuit noted that evidence existed that they were together the morning of the murder. The jury had heard Hobbs' testimony, including the cross examination, yet chose to convict Bonner of the murder, based largely on Hobbs' testimony. The second circuit upheld the conviction, stating that "[a]lthough we acknowledge the legitimate arguments raised by Bonner on appeal, as the reviewing court it is not our role to re-evaluate the credibility of witnesses who testify at trial." *Id.* at 6.

In the current case, Defendant further argues that Rogers' and Furlough's testimonies were inconsistent with each other, and in the case of Furlough, his prior statements were inconsistent with his trial statements, thereby rendering their testimonies unreliable. Defendant points to several disparities in the time line of

events in Lake Charles and in Houston as related by Rogers and Furlough. However, in the absence of internal contradiction or irreconcilable conflict with physical evidence, a witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. White*, 28,095 (La.App. 2 Cir. 5/8/96), 674 So.2d 1018, *writs denied,* 96-1459 (La. 11/15/96), 682 So.2d 760; 98-282 (La. 6/26/98), 719 So.2d 1048. Furthermore, regarding inconsistencies between a witness's pre-trial statement and his trial testimony, this court explained in *State v. Bender*, 598 So.2d 629, 636 (La.App. 3 Cir.), *writ denied*, 605 So.2d 1125 (La.1992):

> When a witness is impeached, this simply means the jury, as the trier of fact, was presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury was prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony.

In the current case, the two eyewitnesses' testimonies were substantially consistent. Although, Furlough testified that he initially lied to the officers and gave facts contradicting some of the facts given by Rogers--for example, that they first observed the Victim walking on the street instead of driving his sister's car. At trial his testimony was consistent with every salient fact testified to by Rogers regarding the Victim in the Isuzu with him, Rogers and Defendant, and the events that occurred leading up to and including the shooting death of the Victim.

Furthermore, the two eyewitnesses' recitation of the crime spree perpetrated by them and Defendant in Houston just prior to the shooting in Lake Charles was corroborated by the testimonies of two of the victims. Ronald Charles was the owner of the white Ford Taurus carjacked in Houston. He described the incident and identified Defendant as the one who fired several shots at him as he ran away. Eddie Sessum, the owner of the black Isuzu Rodeo, testified about the incident of the

11

robbery and carjacking. Even though he could not identify Defendant as one of the participants, his testimony was consistent with the testimony of Furlough as to how the robbery and carjacking took place. Finally, Robert Sherrouse, an officer with the Houston Police Department, Robbery Division, testified that Wade Oliphant, the last victim of Rogers, Furlough, and Defendant just before they left Houston, identified Defendant in a line-up as the gunman who robbed him of his wallet and attempted to carjack his vehicle, as described by both Rogers and Furlough.

The evidence in this case was sufficient for the jury to find beyond a reasonable doubt that Defendant robbed and shot to death Gregory Fontenot. The inconsistencies in the two eyewitnesses' testimonies pointed out by Defendant goes to the weight of the evidence, not its sufficiency, and absent internal contradiction with the physical evidence, this court should not delve into the credibility determinations of the jury. We find there is no merit to this assignment of error.

## ASSIGNMENT OF ERROR NUMBER TWO

Defendant asserts that the trial court erred when it permitted, over Defendant's continuous and strenuous objections, Detective Gregory Kellogg's testimony which, Defendant contents, was riddled with hearsay statements that assuredly attributed to the jury's guilty verdict.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.Code Evid. art. 801(C). However, Louisiana jurisprudence has consistently held that investigating police officers may testify as to statements purportedly given to them, which help to explain the sequence of events that lead to an arrest and not to prove the truth of the matter. *See State v. Watson,* 449 So.2d 1321 (La.1984), cert. Denied, 469 U.S. 1181, 105 S.Ct. 939 (1985); *State v.*

12

*Broadway,* 96-2659 (La. 10/19/99), 753 So.2d 801, *cert. denied,* 529 U.S. 1056, 120 S.Ct. 1562 (2000); and *State v. Blank,* 04-204 (La. 4/11/07), 955 So.2d 90, cert. denied, ___U.S.____, 128 S. Ct. 494 (2007).

In *Broadway*, however, the supreme court noted:

> Information about the course of a police investigation is not relevant to any essential elements of the charged crime, but such information may be useful to the prosecutor in "drawing the full picture" for the jury. However, the fact that an officer acted on information obtained during the investigation may not be used as an indirect method of bringing before the jury the substance of the out-of-court assertions of the defendant's guilt that would otherwise be barred by the hearsay rule. *State v. Wille,* 559 So.2d 1321, 1331 (La.1990); *State v. Hearold,* 603 So.2d 731, 737 (La.1992). As this Court emphasized in *Hearold*, 603 So.2d at 737,
>
> > Absent some unique circumstances in which the explanation of purpose is probative evidence of a contested fact, such hearsay evidence should not be admitted under an "explanation" exception. The probative value of the mere fact that an out-of-court declaration was made is generally outweighed greatly by the likelihood that the jury will consider the statement for the truth of the matter asserted.

*Broadway,* 753 So.2d at 809.

In brief, Defendant lists the declarants of those alleged out-of-court statements as reported by Detective Kellogg at trial: "Deputy Bergeron, Richard Land, Kenneth Bordelon, Daphne Martin (and what she told him was what her husband told her), Detective Rathjen, Detective Daugereaux, Patrick Harrison, Delisa [Malveaux] Fontenot, Darrell Malveaux, Mrs. Exra Miller, Courtney Ashton, Bertha Leday, Horace Lafleur, Michael Rogers, Jerrard Furlough, and Troy Martin."

Of the above-listed declarants, only Daphine Martin (her husband, Troy Martin, testified regarding his observation of a black Isuzu with Texas plates leaving the park in the early morning of the shooting), Deputy Bergeron, Detective Dangereaux, Ezra Miller, and Bertha Leday did not testify at the trial. Deputy Bergeron and Detective

Dangereaux were officers participating in the investigation who had conducted the interviews with the three neighbors who had seen the black Isuzu, heard shots, and found the Victim's body, and reported their finding to Detective Kellogg. According to Detective Kellogg, during the course of his investigation, Bertha Leday told him she had met up with the Victim at Poonie's at about 4:00 a.m. on the morning of the shooting and drove around with him until he dropped her off at approximately 6:00 a.m. Her out-of-court statement only established a time line of the Victim's whereabouts prior to his death. As for Ezra Miller, after the Isuzu was located abandoned behind a house, the neighborhood was canvassed, and Ezra Miller told the detective that she had seen two young black males wiping down the Rodeo. None of the above out-of-court statements were hearsay in that the statements were not offered to prove the truth of the matter, but solely were events in the course of the investigation.

The out-of-court statements that were arguably hearsay were the statements the detective attributed to Rogers and Furlough. After the police had been notified that the gun that was used to shoot the Victim may have been located in Rogers' possession, the police went to his residence where they arrested him and Furlough. Both men were interrogated separately, and both men pointed the finger at Defendant as the killer, each offering enough detail regarding the crime to make their statements credible. The detective testified as to the corroborative facts given by the two men. Defendant objected to Detective Kellogg's testimony regarding what the two co-perpetrators said as impermissible hearsay. In *State v. Wille*, 559 So.2d 1321 (La.1990), two eyewitnesses watched the accused rape, beat, and choke to death an eight-year-old girl and then helped to dispose of the evidence. The investigating

14

officer related the witnesses' out-of-court accusations at the accused's trial.

Discussing the hearsay aspect of the testimony, the supreme court stated:

> The fact that an officer acted on information received in an out-of-court assertion may be relevant to explain his conduct, but this fact should not become a passkey to bring before the jury the substance of the out-of-court information that would otherwise be barred by the hearsay rule. G. Pugh, Louisiana Evidence Law 429-431 (1974).
>
> When an out-of-court statement, such as information received by a police officer during an investigation of a crime, has both an impermissible hearsay aspect and a permissible nonhearsay aspect, the issue of relevancy becomes significantly interrelated with the hearsay issue. If the nonhearsay content of the statement has little or no relevance, then the statement should generally be excluded on both relevance and hearsay grounds. Marginally relevant nonhearsay evidence should not be used as a vehicle to permit the introduction of highly relevant and highly prejudicial hearsay evidence which consists of the substance of an out-of-court assertion that was not made under oath and is not subject to cross-examination at trial.
>
> There was no true issue in the present case as to the propriety of any action taken by Agent Harvey during his investigation of the Lopatta murder. Indeed, an investigating officer's testimony at trial (as opposed to testimony at a motion to suppress), explaining his conduct after an investigation, almost always has only marginal relevance at best. The real purpose of Harvey's testimony in the present case about the information received from Judith and Sheila Walters was to place before the jury the fact that their statements had named defendant as the killer of Nichole Lopatta. The value of the statements rested upon the credibility of the out-of-court assertions. Because Judith and Sheila Walters did not testify, evidence of the fact that their statements named defendant as the killer was otherwise barred by the hearsay rule. Clearly, the extremely marginal relevance of Agent Harvey's testimony for the purpose of explaining his conduct in the investigation was greatly outweighed by the danger that the jury would use this testimony as substantive evidence that Judith and Sheila Walters had named defendant as the killer. The only truly relevant information conveyed by Agent Harvey to the jury was his conclusion, after interviewing two eyewitnesses to the crime for which defendant was on trial, that defendant was the perpetrator and that the eyewitnesses' version of the events was completely corroborated by physical and other evidence uncovered by the investigation. Because the assertions related by Judith and Sheila Walters to Agent Harvey, the substance of which was conveyed to the jury, were presented almost solely for their relevance and assertive value in establishing defendant's guilt and were not given under oath or ever subjected to cross-examination, and because such assertions by accomplices are inherently suspect, the testimony should have been excluded as hearsay and irrelevant evidence.

15

*Id.* at 1331-32 (footnotes omitted).

Similarly, in the current case, Detective Kellogg's testimony described the investigatory steps which led to Defendant's arrest for the crime alleged, and the only relevant information was the detective's conclusion that Defendant was the one who pulled the trigger that killed the Victim and that the eyewitnesses' versions were corroborated by the physical and other evidence. However, unlike *Wille,* the two eyewitnesses testified. Furthermore, in *Wille*, the supreme court stated that "[n]evertheless, the erroneous admission of the hearsay and irrelevant evidence does not require a reversal of defendant's conviction because the error was harmless beyond a reasonable doubt. Reversal is mandated only when there is a reasonable possibility that the evidence might have contributed to the verdict." *Id.* at 1332.

In the current case, the State's case was strong. Defendant had the opportunity to cross-examine the eyewitnesses as to their assertions, and there existed corroborating evidence regarding the major points of their testimonies. *See also State v. Coward*, 01-1178 (La.App. 5 Cir. 3/26/02), 815 So.2d 275, *writ denied,* 02-1457 (La. 5/9/03), 843 So.2d 387.

We find that the out-of-court statements made by the detective of the people listed by Defendant were not admitted to establish the truth of the matter but were explanations of the events which led to Defendant's arrest. Moreover, we cannot say there was a reasonable possibility that the detective's testimony regarding the out-of-court statements of Rogers and Furlough attributed to the verdict. We find there is no merit to this assignment.

16

# ASSIGNMENT OF ERROR NUMBER THREE

Defendant complains that the trial court erred when it permitted evidence of other crimes to be admitted at trial. In brief, he argues that the prejudicial effect of that evidence far outweighed its probative value. See La.Code Evid. art. 403, which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."

As noted above, evidence of a three-day crime spree starting in Houston, Texas and culminating with the robbery and shooting of the Victim in Lake Charles was introduced through the testimony of the two co-perpetrators, victims of two of the crimes, testimony of Robert Sherrouse, an officer with the Houston Police Department, Robbery Division, and the admission of two documents evidencing Defendant's convictions for aggravated robberies committed in Houston.

Louisiana Code of Evidence Article 404(B)(1) provides:

> Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

Defendant argues in brief that the State did not give adequate notice of its intent to use other crimes evidence, that the evidence had no independent relevancy beside merely showing a criminal disposition, that there was no clear and convincing evidence he stole the Isuzu Rodeo, and that the prejudicial effect outweighed the probative value of the evidence.

17

The State argued at trial, and in brief, that the other crimes evidence constituted an integral part of the act. In *State v. Taylor,* 01-1638, pp. 10-12 (La. 1/14/03), 838 So.2d 729, 741-43, cert. denied, 540 U.S. 1103, 12 S.Ct. 1036 (2004), the supreme court discussed at length the admissibility of a seven-day crime spree, which involved dozens of crimes through several states, and the kidnapping and death of a victim in Louisiana, when it related to conduct formerly known as *res gestae,* as follows:

> Generally, courts may not admit evidence of other crimes to show defendant is a man of bad character who has acted in conformity with his bad character. However, under La. C.E. art. 404(B)(1) evidence of other crimes, wrongs or acts may be introduced when it relates to conduct, formerly referred to as *res gestae*, that "constitutes an integral part of the act or transaction that is the subject of the present proceeding." *Res gestae* events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them. A close proximity in time and location is required between the charged offense and the other crimes evidence "to insure that 'the purpose served by admission of other crimes evidence is not to depict defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'" *State v. Colomb*, 98-2813, p. 3 (La.10/1/99), 747 So.2d 1074, 1076 (quoting *State v. Haarala*, 398 So.2d 1093, 1098 (La.1981)). The *res gestae* doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evident under the circumstances. *State v. Huizar,* 414 So.2d 741, 748 (La.1982); *State v. Kimble*, 407 So.2d 693, 698 (La.1981). In addition, as this court recently observed, integral act (*res gestae*) evidence in Louisiana incorporates a rule of narrative completeness without which the state's case would lose its "narrative momentum and cohesiveness, 'with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.'" *Colomb,* 747 So.2d at 1076 (quoting *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)
>
> . . . .
>
> However, under the rule of narrative completeness incorporated in the *res gestae* doctrine "the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors a guilty verdict

18

would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault." *Old Chief,* 519 U.S. at 188, 117 S.Ct. 644.

In the current case, evidence introduced at trial told the story of the continuous drug use, at least five armed robberies (six counting the robbery of the Victim), two carjackings, one attempted carjacking, and a murder, all committed within approximately seventy-two hours. The events leading up to the murder of the Victim were not isolated incidents, but a rolling crime wave and a necessary part of the State's case against Defendant. A trial court's determination of the admissibility of other crimes evidence will not be overturned absent proof of abuse of discretion. *State v. Gibbs,* 41,062 (La.App. 2 Cir. 6/28/06), 935 So.2d 349. In view of the discussion in *Taylor*, we cannot say the trial court abused its discretion when it permitted the introduction of the other crimes evidence in this case.

Defendant further argues that he was not given adequate notice of the State's intent to use evidence of the crimes committed in Houston a few days prior to the incident in Lake Charles which resulted in the Victim's death. As noted above, the State filed notice of intent on January 15, 2008. A hearing was held on January 23, 2008, wherein all the evidence was presented and discussed. Trial commenced on February 27, 2008, five weeks following the hearing on the admissibility of the other crimes evidence.

We note that a filing of the State's intent to use other crimes evidence two days prior to trial has been deemed sufficient and reasonable notice. *See Gibbs,* 935 So.2d 349. Moreover, whereas the evidence was admissible under the integral act doctrine, it is not subject to any notice requirement. *State v. Brown*, 03-1616 (La.App. 4 Cir. 3/31/04), 871 So.2d 1240, *writ denied,* 04-1285 (La. 10/15/04), 883 So.2d 1044.

Defendant also asserts the State failed to meet its burden of proving Defendant committed the crimes by clear and convincing evidence. However, this court has held

that in the case of other crimes evidence, the standard of proof is by the preponderance of the evidence. *State v. Cash,* 03-853 (La.App. 3 Cir. 12/10/03), 861 So.2d 851, *writ denied,* 04-27 (La. 4/30/04), 872 So.2d 472. In the current case, not only did the co-perpetrators testify as to their conduct just prior to the shooting, but two of the victims of the other crimes testified. The Houston officer who had investigated the series of crimes committed between June 3 and June 6 in Houston testified, and documentation of Defendant's convictions of two of the crimes were offered into evidence. We find the State met its burden of proof.

Finally, Defendant argues that the probative value of the other crimes evidence was outweighed by its prejudicial effect. In *Taylor,* 838 So.2d at 745, the supreme court stated that in previous jurisprudence it has been held "that when evidence of other bad acts is admissible as *res gestae,* the probative value of the evidence need to be balanced against its prejudicial effect. . . . However, current cases questions whether the integral-act evidence under La.C.E. art. 404(B) remains subject to the balancing test of La. C.E. art. 403." Without deciding the question, the *Taylor* court went on to state:

> At any rate, the prejudicial effect of the evidence admitted in the instant case does not substantially outweigh its probative value. Although all evidence of other crimes is prejudicial to defendant, the other crimes evidence was necessary to give the jury a complete picture of the events which gave rise to the instant offense and led to the defendant's ultimate arrest along with a context within which to evaluate defendant's assertion that he was a passive participant.

*Id.*

Similarly, in the current case, while Defendant did not testify, his statement to the police denying his participation in the offense was submitted to the jury. Defendant claimed the gun that killed the Victim was not his gun. However, the other crimes evidence indicated otherwise, including Defendant's propensity to fire the gun

20

at persons he robbed. The jury was entitled to have this information in order to have a complete picture of the events leading up to and resulting in the Victim's death. Regardless that the other crimes evidence was prejudicial, as noted by the *Taylor* court, "the state cannot be faulted for the amount of other crimes evidence introduced at trial given defendant went on a crime spree. . . ." *Id.* at 745.

There is no merit to this assignment.

### ASSIGNMENT OF ERROR NUMBER FOUR

Finally, for his last assignment of error, Defendant asserts the trial court erred when it refused "to allow defense counsel to elicit detailed testimony regarding other suspects in the investigation, namely Chad Eaton."

At trial, testimony established that the Victim was a drug dealer and user himself. During the autopsy, the coroner found crack cocaine and Xanax in the Victim's socks.

Out of the presence of the jury, Detective Kellogg told the trial court that Chad Eaton's name had surfaced because there was a "rumor on the street that Mr. Fontenot had been involved in the . . .theft of some marijuana from Mr. Eaton." The detective stated that he was told this by Detective Leslie Blanchard. Moreover, an "associate" of Eaton, a man named Gerald Thibodeaux, supposedly told Detective Blanchard that Eaton had told him that he was present at the shooting. However, Thibodeaux later stated he never made that statement to Detective Blanchard. The trial court would not permit Detective Kellogg to testify as to what Detective Blanchard said that Thibodeaux had told him.

Defendant argues in brief as follows:

> The trial court finally allowed defense counsel to elicit Mr. Eaton's name and that Mr. Eaton was living in Lake Charles at the time of Greg Fontenot's death. Despite the fact that much more information about Mr. Eaton was available to the State (as evidenced by the Assistant

21

District Attorney's lengthy recital--in a bench conference--of the details surrounding the investigation of Mr. Eaton), the trial court allowed no further testimony to be elicited regarding Mr. Eaton.

We find that the above assertion is not quite correct. The trial court stated that Defendant must put Detective Blanchard on the stand to obtain any information regarding Eaton's possible involvement, which Defendant did during the presentation of his defense.

Detective Blanchard testified that at the time of the shooting, he was a Lieutenant with the Calcasieu Parish Sheriff's Office, in charge of the violent crime division. He stated that during the course of the investigation he spoke with both Thibodeaux and Eaton. He testified that initially he spoke with Thibodeaux on the morning of June 11 at his home. Later, Thibodeaux called the detective and asked to speak with him again. At the police station, Thibodeaux told the Detective that Eaton had admitted to him that he was involved in the killing of the Victim. Thibodeaux told the detective that Eaton had said, "they were going to get him, and they did," because of some drugs that were stolen from Eaton. Detective Blanchard testified that after he talked with Thibodeaux, he asked him if he would make a formal statement on tape but that Thibodeaux refused to do so. The detective stated that Eaton lived in close proximity to the park where the Victim's body was found. In response to Thibodeaux's statement, the police searched Eaton's apartment and found marijuana there. However, during the course of the investigation, the detective learned that the gun that allegedly killed the Victim was located in someone else's possession, that Rogers and Furlough had confessed and implicated Defendant, and the investigation of Eaton derailed. The detective learned much later that Thibodeaux denied ever making the statement to him.

22

Tav Pitre testified that at the time of the shooting, she was the Victim's girlfriend and that the Victim was on his way to see her in Johnson Hall that morning. She said that at one time Eaton had given her sister marijuana to sell. She stated that the marijuana was on her bed in the room she shared with her sister. She said that the marijuana disappeared from her bedroom. David Zeno testified that he was the one who took the marijuana and that he had shared it with the Victim. Furthermore, Zeno testified that the Victim had a habit of taking drugs that did not belong to him and not paying for them.

Defendant then argues in brief that the trial court "failed to allow Clyde Jones to present a valid defense." Defendant asserts that all the evidence in this case was circumstantial:

> "[e]xcept the testimony of Rogers and Furlough, which is simply unreliable. Therefore, in order to convict Mr. Jones, the evidence must exclude every reasonable hypothesis of innocence. When there is another suspect who has not been reliably eliminated from investigation every reasonable hypothesis of innocence has not been excluded."

However, the fact of another suspect in the case was presented to the jury. The jury heard that the Victim was a drug dealer and that he had a propensity to steal drugs, that he may have taken drugs from Eaton, and that Eaton lived within a close proximity to where he was murdered. Moreover, there was a statement made that Eaton had said he was involved with the shooting but that the statement was eventually denied by the declarant. We find that the jury considered all the facts presented and reasonably rejected the hypothesis that Defendant was innocent of the charge. We find there is no merit to this assignment of error.

## CONCLUSION

Defendant's conviction of second degree murder is affirmed.

**AFFIRMED**.

23